## THE BRISTOL.

*(District Court, S. D. New York. February 21, 1882.)*

1. COLLISION—STEAM-TUG AT REST NOT TO EMBARRASS APPROACHING STEAMER.
   A steam-tug lying at rest in a stream, after being signaled by another approaching steamer, indicating on which side the latter proposes to pass her, has no right to embarrass the latter's course by giving contrary whistles and starting ahead across the other's bows; and if, in consequence of doing so, a collision ensue, the tug must be held in fault.

2. SAME—CONTRARY SIGNALS—CROSSING COURSES—FAULT NOT STOPPING IN TIME.
   Where, in such a case, it was perceived from the steamer that the tug was moving forward across the steamer's proposed course, under contrary signals, involving obvious risk of collision if the tug's course was continued, and the steamer kept on until very near the tug before stopping and backing, and a collision ensued, *held*, that the steamer was also in fault.

3. MARITIME LIEN—EFFECT OF DELAY IN ENFORCING.
   A maritime lien will not be enforced as against *bona fide* purchasers after reasonable opportunity has been afforded and no libel filed.

4. SAME—LIEN LOST BY LACHES—RIGHTS OF BONA FIDE PURCHASER.
   The colliding steamer in this case having been sold to *bona fide* purchasers about two years after the collision, who made careful inquiries to ascertain all outstanding claims, and who also kept on deposit a large sum from the purchase price for four months afterwards, to meet any latent claims, and the purchase price having thereafter been paid in full without knowledge of the present claim, and the libel not being filed until more than two years afterwards, nearly four years and a half after the collision, and the steamer having been at all times, except in the winter months, constantly plying between this port and Fall River, *held*, that the lien was lost, and the libel should be dismissed.

5. SALE OF VESSEL—COVENANTS OF WARRANTY AGAINST LIENS.
   Covenants of warranty, in the bill of sale, against liens or encumbrances, are immaterial as respects the discharge from liability of a *bona fide* purchaser.

In Admiralty.

*Beebe, Wilcox & Hobbs*, for libellants.

*Prichard, Choate & Smith*, and *Wm. G. Choate*, for claimants.

BROWN, D. J. This libel was filed to recover for damages for injuries to the steam-tug Relief, inflicted by the steamer Bristol in a collision on the East river, near the Fulton ferry, on the morning of July 5, 1872, under the following circumstances:

The Relief, about 7 o'clock in the morning of that day, left pier 20 on the East river, New York, and steamed across the river towards the Brooklyn shore, designing to take in tow to Harlem an ice-barge which the steam-tug Birbeck was to cast loose, and put in charge of the Relief. The Birbeck came up the river on the New York side and let go the barge not far from the middle of the stream, and the Relief was lying at rest, waiting for the barge

to drift somewhat further up the river, before proceeding to fasten along-side. While the Relief thus lay at rest, heading partly towards the Brooklyn shore and partly up the river, and drifting with a strong flood tide, she was sighted by the steamer Bristol, coming down the East river on one of her regular trips from Fall river to New York, when about one-half or three-quarters of a mile distant, about half a point on her starboard bow. A signal of two whistles was blown by the Bristol, signifying her intention to go to the left, *i. e.*, between the Relief and the Brooklyn shore, and her wheel was put to starboard. The Relief answered at once with one whistle, and immediately started her engine at full speed, and headed for the Brooklyn shore. The Bristol at once repeated her signal of two whistles, adhering to the former notice that she was to go to the left, and shortly after rang her bells to slow the engines. The Relief responded again with one whistle and kept on. The Bristol then signalled her engines to stop and back, and gave several whistles indicative of danger. By this time she had approached quite near to the Relief, and, before the Bristol could be stopped, she struck the Relief upon her port quarter, with a blow somewhat angling, about 12 feet from her stern, carrying away the rudder and a portion of her stern.

The evidence was conflicting as to the distance of the Relief from the Brooklyn shore, as she lay at rest when first sighted by the Bristol, and also as to which gave the first signal to the other. There were but three persons on board the Relief. Two of them, the pilot and the deck hand, testify that she lay about 100 yards off the Brooklyn shore. The captain and the lookout of the Bristol testify that the Relief seemed to them to lie nearer to the New York than to the Brooklyn shore. The testimony, however, of Albertson, one of the Fulton ferry pilots, called by the libellants, furnishes the most trusty evidence upon this point. He had left the Fulton ferry slip in charge of one of the ferry-boats, on one of her regular trips to New York, and had come out into about the middle of the stream, and turned directly down the river, and passed astern of the Relief. He testifies that the Relief was about half way between him and the Brooklyn shore, and that he passed the ice-barge adrift upon his starboard hand, and within three rods of it. The width of the East river at this point is about 1,800 feet, and as this testimony of the pilot would place the Relief at about one-quarter of the distance across from the Brooklyn side, she must have been at least 450 feet distant from that shore.

There are other circumstances which would indicate that the Relief must have been lying even further out into the stream than this estimate. The same pilot testifies that he saw the collision, and that it was about two of his boat lengths, *i. e.*, 326 feet, off the upper Brooklyn ferry slip. The Relief had been under way, heading, ac-

cording to her own witnesses, direct for the Brooklyn shore, from the time of her first whistle until the collision, under the full speed of her engines. When the Relief's engines were thus started, the Bristol was from a quarter to half a mile distant. She did not approach the Relief at over an average speed of ten knots, so that nearly two minutes must have elapsed from the time the Relief started her engines until the collision, when, as conceded by the libellants, the Relief must have attained a speed of four miles per hour. From a condition of rest to that speed, at the end of two minutes, a computation will show that the Relief must have gone forward at least 350 feet from her first position, and this is confirmed by the estimate of one of her witnesses, as first given; and if, at the collision, she was 326 feet from the shore, she must have been when she started her engines from 600 to 700 feet from shore, or about one-third the distance across the river. This estimate I regard, therefore, as much more probable than the rough estimate of 100 yards given by two of the libellants' witnesses, after so great a lapse of time; and no reason appears why the Relief, in waiting for the barge to float up past her on the New York side, should have gone so near to the Brooklyn shore.

Upon the question, which gave the first signal to the other, I think the weight of the testimony is in favor of the claimants. On board the Bristol, the captain, the two front pilots at the wheel, and the lookout were all in a position to observe, and were specially charged with the duty of observing, vessels lying in their course, and of giving suitable signals, and they would be naturally more observant than those on board the Relief, which was lying at rest in the stream. The former all testify that their signal of two whistles was given before any signal was heard from the Relief, and that the first signal from the Relief, of one whistle, was heard immediately after theirs; and the statement of the libel, that the Relief started after the two whistles from the Bristol, agrees with the testimony of the Bristol's witnesses, but is not reconcilable with the testimony of the witnesses from the Relief upon the trial.

When this first signal of two whistles was given from the Bristol the Relief was at rest, and the Bristol had, therefore, the right to choose on which side of the Relief she would go. Nothing indicated to the Bristol the intentions of the Relief,—whether she was expecting to go forward or to go backward,—except the possible conjecture that she had some connection with the ice-barge, which was adrift, unattended, upon her port quarter. The ferry-boat, which was also be-

tween the Relief and the barge, would give to the Bristol the appearance of less room to the right of the Relief than to the left-hand side of her; and such is the testimony of the lookout. Upon this point, however, the captain and the pilots have no definite recollection after the lapse of 10 years. With these two vessels in the midst of the river, and one of them adrift, and assuming the Relief to be at rest when the Bristol's first signal of two whistles was given, and in a position from one-fourth to one-third of the distance across the river from the Brooklyn shore, there is no rule which forbade the former from going to the left, as she signalled her desire to do, where there appeared to be the most room, and where the space was amply sufficient for that course. The rule strenuously contended for by the libellant, requiring vessels to pass to the right, applies only to vessels in motion. The Bristol had the Relief on her own starboard hand about one point. The rule which required her to keep out of the way of the Relief was also designed to apply, and in terms applies, only when both vessels are under way; but, as the Relief was at rest, it was equally the duty of the Bristol to keep out of her way, independent of all special rules. Under these circumstances, having signalled her choice to go to the left, and there being plenty of room to do so, the Relief had no right to embarrass the Bristol in the course she rightfully adopted by undertaking to cross this course, which had previously been made known to her. In doing so she became chargeable with the first fault which led to the collision. Had she remained still, as she was when the the Bristol's first signal was given, the Bristol would obviously have passed well inside of her. As we have seen, the Relief had changed her position upwards of 300 feet, or more than three times her length, and the starboard wheel of the Bristol, under which the latter would have kept on if her course had not been embarrassed, was necessarily again changed to port before the collision, thus bringing her less to the southward than she would otherwise have gone, which shows that the Bristol would easily have cleared the Relief by one or two lengths of the latter, had the latter remained in her first position. And so, also, if the Relief had reversed her engines when the second signal of two whistles was given from the Bristol, reiterating that she must go to the left, which immediately followed the first contrary whistle from the Relief before she had got under much, if any, headway, it is equally clear that the collision could have been avoided. This was perfectly within the power of the Relief to do, while the course of the Bristol, a vessel of 2,960 tons, and 373 feet

long, was not capable of any very great change after she signalled and had thrown her wheel to starboard. The collision must, therefore, be held chargeable primarily to the fault of the Relief in starting to go across the course of the Bristol, and in persisting in so doing notwithstanding the signals to the contrary.

But although I find that the Bristol was justified in shaping her course to the southward of the Relief, it seems to me also clear that she did not exercise that degree of promptness and diligence which was required of her under the twenty-first rule, in stopping and backing when danger of a collision was obviously imminent.

After the lapse of so many years considerable variation was to be expected in the estimates of the distance between the two boats at the times of the various signals exchanged between them. The master of the Bristol estimates that when the Relief started forward and gave her one whistle in immediate answer to the previous two whistles of the Bristol, they were from a quarter to a half a mile apart. The Bristol was already sheering to the southward under a starboard wheel. The imminent danger of collision was obvious unless the Relief should immediately reverse her engine. As she had already disregarded the previous signal of the Bristol, and had answered showing a contrary determination, and had already started forward, I do not think the Bristol was justified in assuming that she would reverse this determination on a repetition of the Bristol's signal of two whistles, or in waiting as she did to see the result of a repetition of her own signal, before stopping and backing.

The testimony of the engineer furnishes the best indication of the time before the collision when the bells to stop and back were given him. He estimated it at about 15 seconds only, during 10 of which the engine was backing. He says that she made about one and a quarter revolutions backward; and this accords nearly with his estimate of time. Before the signal to stop and back, he says he was running under a slow bell for about three-quarters of a minute, and this is an estimate only. The captain states that he rang the bell to slow after the first whistle from the Relief, and after an immediate repetition of his signal of two whistles, and that he did not stop and back until after the repetition by the Relief of her single whistle. Captain Keenan, one of the pilots, says, "We were close onto her [Relief] when the bells came to stop;" and this accords with the engineer's testimony. All the other testimony confirms the master's statement that they were from a quarter to a half a mile apart when

the Relief gave her first whistle and started towards the Brooklyn shore; and, as I have stated above, this must have been nearly two minutes before the collision. During this time there were but two exchanges of signals. If they were given, as is stated in some of the testimony, as quickly as they could be exchanged, there must have been considerable delay on board the Bristol in backing after the last signal from the Relief; and if, on the other hand, the exchange of signals was delayed, the master of the Bristol was not justified in keeping on so long to see whether the Relief would not change her course.

The master testified that under a slow bell the Bristol could be stopped in running twice her length—a little over an eighth of a mile. The Relief was struck only 12 feet from her stern, and a delay of three seconds in the approach of the Bristol would have avoided the collision. Upon the claimant's own testimony, as it stands, I must hold that the Bristol should have stopped, and backed her engines, at least half a minute before she did, and that had she done so a quarter of a minute earlier the collision would have been avoided.

Upon the foregoing views the damages in this case would therefore be apportioned, were it not for the additional defence interposed by the claimants that the libellants have lost their lien through their laches in asserting it as against the claimants, who became *bona fide* purchasers of the Bristol over two years before the libel was filed.

At the time of the collision, July 5, 1872, the Bristol was one of the Fall River line of steamers owned by the Narragansett Steamship Company of Rhode Island. On June 8, 1874, this company sold all its property, including the Bristol, for $1,600,000, subject to certain mortgages to the Old Colony Steam-boat Company of Massachusetts, who are the claimants in this case; and the former company thereupon went out of business and became practically defunct. Prior to the sale, the claimants in this case used all practicable means of ascertaining what liens, encumbrances, or charges existed against the property purchased. Many such claims thus became known to them, not, however, including the claim in suit, of which they had no knowledge or notice until more than two years afterwards. At the time of the sale to the present claimants a deposit of bonds to the amount of $100,000 was made in the hands of trustees for the purposes of indemnity against all outstanding claims or demands upon the steam-boat property, which remained for about five months, until October 30, 1874, when all known claims upon the property having

been liquidated, the bonds retained as indemnity were surrendered to the vendors. The residue of the purchase price, it appears, was paid in June, 1874, at the time of the sale. This libel was filed on November 13, 1876.

The excuse offered by the libellants for the delay of nearly four years and a half in filing their libel, is that when the claim was first placed in the hands of their proctors, shortly after the collision, promises of settlement were made by persons connected with the Narragansett Company, and that the proctor who had special charge of the case having awhile afterwards become disconnected with the office, it was not until several years afterwards that his remaining associates discovered that the libel had not been filed. The Bristol, during all this period, had made her usual trips between New York and Fall River thrice a week, except during the winter months, when she was laid up; and there had, therefore, been the most ample time and opportunity for the libellants to assert their lien during the period of nearly two years which elapsed from the time of the collision until the sale to the present claimants.

The reasons offered for the delay are not such as concern *bona fide* purchasers, and cannot be held to affect their rights. It has long been settled that the privilege of a maritime lien, which is in the nature of a latent, unregistered mortgage, will not be enforced against *bona fide* purchasers or encumbrancers, without notice, after the failure to assert it within a reasonable period, and where ample opportunity for doing so has been offered. In the case of *The Utility*, Bl. & H. 218, the subject was carefully examined by *Betts*, J., more than 50 years ago, and he finds it to be "a principle common to the maritime law, wherever it is administered, that all liens upon vessels are temporary and evanescent, and cannot be continued any longer than until a reasonable opportunity has been offered for their enforcement;" and the libel filed in that case, a little over two years after the supplies were furnished, was dismissed as against *bona fide* purchasers. In the case of *The Nevada*, 2 Sawy. 144, a libel was filed about two years after the cause of action occurred, and was dismissed as against an intervening mortgagee. In *The Lauretta*, 9 FED. REP. 622, the libel was dismissed as against an intervening purchaser upon a similar delay of two years. In *The Eliza Jane*, 1 Spr. 152, upon a libel for supplies, the lien was held lost as against a purchaser after a delay of eight months only. In *The General Jackson*, 1 Spr. 554, a lien for supplies was held barred as against

the purchasers after a delay of 20 months.   In *The Lillie Mills*, 1 Spr. 307, a similar claim was held barred as against a purchaser who bought the vessel about a year after the supplies were furnished.   In *The Artisan*, 8 Ben. 538, the lien of a seaman's wages was held barred as against a *bona fide* purchaser two years and a half afterwards.   In *The Columbia*, 13 Blatchf. 521, a libel for damages by a collision was dismissed as against a *bona fide* mortgage taken two years and a half after the collision.   And in the case of *The Admiral*, 18 Law Rep. (N. S.) 91, a similar libel for a collision was dismissed as against a corporation purchaser 20 months afterwards; and in that case it was also held that the fact that some of the stockholders of the purchasing company were also stockholders in the prior corporation, who were the vendors, did not affect the purchasers with notice of the lien.

The general doctrine on this subject is concisely stated by *Sprague*, J., in *The Lillie Mills*, above cited, in which he says:

"If there had been no transfer or attachment of the property, I should hold the lien was not lost.   When the rights of third persons have intervened, the lien will be regarded as lost if the person in whose favor it existed has had a reasonable opportunity to enforce it, and has not done so.   This is a well-settled rule of the admiralty.   The lien for supplies has its origin in the necessities and convenience of commerce and navigation.   It is for the interest of navigation and commerce that these liens should exist, and it is equally so that they should not be allowed to extend unnecessarily to the injury of innocent third persons.   In this case there can be no doubt the libellant has had ample opportunity to enforce his lien, and it cannot now be allowed to prevail against the rights of *bona fide* purchasers or attaching creditors."

The cases on this general subject are very numerous, and the same principles are declared in them all without exception.   See *The Key City*, 14 Wall. 653; *The Eastern Star*, 1 Ware, 185; *The Louisa*, 2 Wood & M. 55; *The Bolivar*, Olc. 474; *The Buckeye State*, Newb. 111; *The Dubuque*, 2 Abb. (U. S.) 33; *The D. M. French*, 1 Low. 43; *The Wexford*, 7 FED. REP. 674; *The Robert Gaskin*, 9 FED. REP. 62. It is only where no reasonable opportunity has existed to enforce the lien through the absence of the vessel or the libellant, or other sufficient cause, that the lien is upheld as against subsequent purchasers or encumbrancers.   *The Atlantic*, Crabbe, 440; *The Eliza Jane*, 1 Spr. 152; *The Prospect*, 3 Blatchf. 526.

It is claimed on behalf of the libellants that this exemption of *bona fide* purchasers should not be allowed if the latter would have a legal remedy over against their vendors upon covenants against encum-

brancers, or covenants of indemnity in the bill of sale of the vessel. In the decisions upon this subject, however, I do not find any warrant for this distinction. The libellants, in all these cases, have a remedy *in personam* against the vendors. If, at the time the libel is filed, the vendors are responsible, the remedy of the libellants against them would be available, and there is no reason why they should not be required directly to pursue that remedy themselves, rather than be permitted to subject *bona fide* purchasers to two suits,—one to defend against the libellant's claim, and, if unsuccessful in that, then a second to obtain indemnity against their vendors upon their covenants.

It is clear that if *bona fide* purchasers are to be protected at all, they should be exempted from the annoyance and vexation of such litigations; otherwise, their protection would be but partial and inadequate, and scarcely worth the name. Such covenants of warranty, moreover, are not taken for the benefit of third persons; certainly not for the benefit of those who have lost their lien through laches in asserting it; nor is there any reason for holding that *bona fide* purchasers shall be worse off and less entitled to protection in consequence of their having taken covenants of indemnity than if none had been given. If, on the other hand, the vendors are irresponsible at the time of filing the libel, a covenant of indemnity would be of no value. In none of the cases on this subject has the decision turned at all upon the question whether the purchaser has or has not any available remedy against the vendor, but solely upon the laches of the libellant, by which, after full opportunity to enforce his lien, it is held waived as against *bona fide* purchasers. If the distinction claimed were allowed, the mere taking of a warranty would deprive a vendee of the protection of a *bona fide* purchaser. The point was raised in the case of *The Detroit*, 1 Brown, 141, and held by *Swayne*, J., (p. 147,) to be unsound. *The Hercules*, 1 Brown, 560, 565.

The purchasers in this case took every reasonable precaution to provide for latent claims upon the vessels purchased. They not only made full inquiry from the vendors, and an examination of their books, to ascertain all such outstanding claims, but they also searched the records and dockets of all courts where claims might be filed, or proceedings pending, and withheld for nearly five months the sum of $100,000, placed in the hands of trustees, to cover any such claims. The sale of the property was in summer, while the Bristol was constantly running upon her tri-weekly trips to and from New York, and

the transfer was a matter of public notoriety, and generally known in shipping circles. Nevertheless, the libel in this case was not filed until more than two years after the fund reserved had all been paid over in ignorance of this demand. Whatever may have been the accidental circumstances, on the part of the libellants or their proctors, which led to this extreme delay, they do not affect the equities of the claimants, or the principles upon which their exemption is founded; and upon this ground the libel should be dismissed, with costs.