## The C. N. Johnson.

*(District Court, E. D. Michigan.   February 18, 1884.)*

1. MARITIME LIEN—CREDITOR ENFORCING LIEN AGAINST VESSEL—DUE DILI-
GENCE.

   The obligation of a creditor to use due diligence in the enforcement of his
   lien upon a vessel, as against a *bona fide* purchaser, is not always discharged by
   taking out process in the port or district where the claim accrued and putting
   it in the hands of the marshal, even though that may be her home port or
   one she has been in the habit of frequenting.   There are circumstances under
   which he may be bound to follow her into other districts.

2. SAME—BONA FIDE PURCHASER—KNOWLEDGE OF CREDITOR.

   A vessel was repaired at Chicago in the spring of 1880, and was soon after-
   wards taken to Lake Erie.   In the spring of 1881 she was sold to a person re-
   siding in Buffalo, who had no notice of the claim for repairs, and continued to
   run upon the lower lakes.   The creditor was thereupon informed of such sale,
   soon after it took place, and of the fact that she was navigating the lower lakes,
   but made no attempt to enforce his claim until December, 1882.   *Held,* that he
   should have endeavored to seize the vessel at Buffalo, or some other port which
   she frequented, as soon as he was informed that she had been sold; and that
   his claim was stale.

In Admiralty.

This was a libel for repairs put upon the schooner C. N. Johnson,
at the port of Chicago, in the spring and early summer of 1880, to
the amount, including interest, of $710.34.   Defense, stale claim.
One Buckley was the real owner of the vessel, though the title stood
of record in the name of Joseph Single, of Wausau, Wisconsin.   Mil-
waukee was her home port.   After the completion of the repairs, in
June, 1880, the schooner made one trip to Green Bay, and was then
taken to the lower lakes, where she continued to run until the libel
was filed.   Payments of money on the work done were made by Buck-
ley to libelants as late as July, 1881.   In the fall of 1880 Buckley,
representing himself as the real owner of the vessel, began negotiat-
ing with one Weeks, the present claimant, to exchange her for the
schooner Malta, then known as the Vosberg, stating, as Weeks claimed,
that the Johnson was unincumbered, though Buckley denied this.
The parties met in March, 1881, at Buffalo, where two or three con-
versations occurred between them as to their respective vessels,
Weeks insisting on $500 in cash, in addition to the Johnson, for the
Vosberg.   But he finally concluded to make an even exchange; and
mutual transfers took place on April 4, 1881, the outfit of each vessel
being excepted from the trade.   On the eighteenth of April, Weeks
received from Joseph Single a bill of sale of the Johnson, with cov-
enant to defend her against all demands, and executed a like bill of
sale of the Vosberg to Single.   At the time of the exchange there
was a mortgage upon the Vosberg, given by Weeks to Vosberg and
Baker, of Buffalo, on which there was due about $1,000.   This Weeks
procured to be discharged within a few days after the sale, executing
and delivering to the mortgagee, in lieu thereof, a mortgage for the

like amount upon the C. N. Johnson. This latter mortgage Weeks paid in full, in November, 1882.

BROWN, J. Two questions are presented by the record in this case: (1) Whether Weeks, the present owner, purchased the schooner without notice of libelants' claim; (2) whether libelants were guilty of laches in not taking earlier proceedings against the vessel. The claimant, Weeks, is sought to be charged with notice by the testimony of Buckley, the vendor, who says he told Weeks, on two different occasions, that the Johnson owed a ship-yard bill at Chicago, but did not state the amount, as he did not know himself the balance due to the libelants. Weeks, he says, made no reply. In this connection he states that he told Weeks that if the Malta was as good as represented he would take care of this bill himself. Libelants' proctor also swears that when he presented the bill to Weeks, in December, 1882, he admitted knowledge of it at the time of the purchase. This is all the direct testimony upon the subject of notice. Upon the other hand, Weeks swears positively that he had no notice of the claim, and denies the conversation with the proctor. He is corroborated by his wife, by the witness Edward Smith, and Frederick Emery, all of whom were present at one or more conversations, during which the terms of the sale were settled, and who testified that Buckley represented to Weeks that the Johnson was unincumbered. It is quite improbable, too, that after holding the matter under advisement for several months he should have bought the vessel, knowing there was a claim against her, without inquiring who owned it, or its amount.

Buckley's testimony is open to grave suspicion, as he induced the person who held the legal title to give a bill of sale, in which there was an absolute and unqualified covenant to pay all demands against the vessel. This is a direct contradiction of his assertion that he agreed to pay such demands only in case the Vosberg proved to be as good as represented. He also expressly admits that, by the terms of the sale, the vessels were exchanged even and clear of incumbrances. It is not denied that Weeks carried out his part of the bargain by procuring the release of the Malta from the mortgage running to Vosberg and Baker, who consented to accept, and actually received, from Weeks security upon the Johnson for the debt from which the Malta was released; and that Weeks paid the mortgage before the filing of this libel. I think the probabilities of the case outweigh the testimony of libelant's proctor as to Weeks' admissions to him. While there is nothing to criticise in his credibility as a witness, he may have misapprehended the drift of Weeks' statement. As was said by Judge BETTS in *Sunday* v. *Gordon*, Blatchf. & H. 569–576, too much reliance should not be placed upon the version of conversations given by a witness who is seeking through them the means of maintaining an action in favor of his employer. However honest or commendable his motive might have been, a witness so employed would be exceedingly apt to remember statements favoring the

wishes of his employer, and to forget or not listen to explanations and qualifications made at the time. While there is no impropriety in an attorney taking the stand to make parol proof of uncontested facts, such as the signature to an instrument, or the indentification of a public record, the practice of making a case for his client in the character of a witness is not usually favored by the courts, although there is now little question of his competency to testify. Weeks, Attys. §§ 124, 125; Whart. Ev. § 420; *Potter* v. *Inhab. of Ware,* Cush. 519–524; *Follansbee* v. *Walker,* 72 Pa. 230.

The question of laches on the part of the libelants is less difficult of solution. It may be conceded that they were under no obligations to take proceedings during the season of 1880. The sale was made early in the spring of 1881, and the testimony shows conclusively that they were informed of it very soon after it took place. They made no effort, however, to collect of the vessel until December, 1882, when the claim was forwarded to their proctor here for collection, and the vessel was seized a few days thereafter. Their excuse for this delay is that the vessel left Lake Michigan shortly after the repairs were made, and continued upon the lower lakes, out of the reach of process of the district court of Northern Illinois, during all this time. This defense raises the question whether the duty of a creditor to use due diligence in the enforcement of a lien, as against a *bona fide* purchaser, is discharged by taking out process in the district court where the claim accrued, and awaiting the return of the vessel to that district for her seizure. Courts have held in general terms that, as against innocent third parties, the lien will be presumed to have been waived if the creditor has not availed himself of a fair opportunity to enforce it; and in some cases it has apparently been assumed, but I believe never decided, that the creditor need do no more than wait for the return of the vessel to his own port, or take out process in his own district, and put it into the hands of the marshal.

In *The Emma L. Coyne,* 11 Chi. Leg. N. 98, I had occasion to hold that, under the peculiar circumstances of that case, where the lien-holder and the owner of the vessel were both residents of the same district, there was no obligation on the part of the former to pursue the vessel into another district to prevent his claim from becoming stale. No opinion, however, was intimated as to the necessity of doing this in case the vessel were sold to an owner living in another state.

In *The D. M. French,* 1 Low. 43, 45, the learned judge for the district of Massachusetts intimated that, with the modes of communication now within reach of every one, lienholders might be required to follow a vessel into another state, at the risk of losing their privilege, though he was not called upon to decide the question.

Where a vessel leaves a port of repair upon a long voyage, and does not return, and, in the mean-time, it is impossible, or very difficult, to ascertain her whereabouts, there is certainly reason for saying

that a creditor would not be chargeable with laches, as against inno-
cent parties, even by the lapse of several years, if he had reasonable
expectation of her return. But I find it quite impossible to say t at,
as a universal rule, the creditor may wait until her return to the port
of repair, even though that be her home port, or a port which she has
been in the habit of frequenting, without losing the benefit of his lien.
A rule of this kind would be particularly inequitable upon the lakes,
where the arrival and departure of vessels at all lake ports, from
Chicago to Ogdensburgh, are noticed in the principal daily papers, and
for four months in the year the entire shipping of the lakes is laid
up by the ice to await the opening of navigation. I think that a rea-
sonable opportunity to enforce a lien is given, within the meaning of
the law, whenever the creditor is able, by the exercise of reasonable
diligence, to ascertain the whereabouts of the debtor vessel. Each
case must be governed largely by its own circumstances.

In the case under consideration, libelants were not only informed
of the sale very soon after it took place, but of the removal of the
vessel to the lower lakes, and were notified by Buckley in the spring
of 1882, that he should pay nothing more upon the bill, as the Malta
was not as represented, and that they must look to the Johnson for
the residue. They took no steps, however, even to notify the pur-
chasers of the claim, until December of that year, when it was for-
warded to Detroit for collection and the vessel seized within 10 days
thereafter. There is nothing in the testimony to show that the ves-
sel might not have been arrested during the season of 1881, or at
least in the winter of 1881–82. It is true that no damage was occa-
sioned to the present owner by the libelants' delay after the sale took
place, but this objection was disposed of in the case of *The Theo-
dore Perry,* 8 Cent. Law J. 191, and it is unnecessary to repeat what
was said upon the subject upon that occasion.

Under the circumstances of this case, it seems to me entirely clear
that the libelants were guilty of laches, and that the libel must be dis-
missed.