## THE ALLIANCA.

### COMMERCIAL UNION INS. CO., Limited, v. PROCEEDS OF THE ALLIANCA.

#### (District Court, S. D. New York. November 26, 1894.)

GENERAL AVERAGE—JETTISON—NO LIEN ON SHIP FOR CARGO'S SHARE—LACHES —MORTGAGEE.

The owner of the steamship A. having collected in 1891 from cargo owners the amounts imposed on them by a general average adjustment for a jettison: *Held* (1) that a lien on the ship in behalf of the insurer of cargo jettisoned is limited to the ship's own share, as adjusted, and does not extend to sums collected by the ship owner from the owners of cargo saved; (2) that no action for a general average charge is maintainable until an average adjustment is made, though the lien therefor was previously inchoate; (3) that there having been great delay in completing the general average adjustment, and a loss of the bill of lading as a necessary voucher, the delay of about nine months after the libelant had notice of the adjustment was not such laches as to bar its lien as against a mortgagee of the ship claiming the proceeds.

This was a suit by the Commercial Union Insurance Company, Limited, of London, to enforce a claim for general average against the proceeds of the steamship Allianca.

Butler, Stillman & Hubbard and Mr. Mynderse, for libelant.

Carter & Ledyard and E. D. Baylies, for Atlantic Trust Co., mortgagee.

BROWN, District Judge. The above libel was filed to recover a sum due for general average on account of the jettison of 100 cases of turpentine from the steamship Allianca during her voyage from this port to Rio de Janeiro in June, 1889. The cause has been submitted upon an agreed statement of facts, from which it appears that the libelant insurance company, as insurers, had paid Crossman & Co., the shippers and owners of the goods, for the loss of the turpentine; that the turpentine was shipped under a bill of lading which excepted losses arising from perils of the seas or jettison; that the jettison was a proper one, under the circumstances of the voyage; that an adjustment of the general average against ship and cargo was made after the arrival of the ship at Rio, first, by Johnson & Higgins, adjusters at this port, which, with certain corrections, was afterwards adopted and adjusted at Rio, and completed there on May 16, 1891; that the whole average amount payable on account of the jettisoned turpentine was $533.69; that the United States & Brazil Mail Steamship Company, the owner of the Allianca, upon the arrival of the vessel at Rio, took an average bond from the cargo owners for the payment of their shares when adjusted, and subsequently collected

substantially all the amounts payable by the cargo according to the adjustment, amounting to about one-half of the whole average; that the steamship company became insolvent in February, 1893; that the libelant claims by subrogation the amount of average payable to Crossman & Co. on account of the goods jettisoned; that various steps were taken from time to time by letters of inquiry of the agents of the assured at Rio, urging attention to the matter and to procure payment of the claim; but that through the loss of the bill of lading, which had been previously forwarded thither before the adjustment was completed, and apparently through some dilatoriness in the proceedings on the part of those agents at Rio, no legal steps were taken, nor was any proper presentation of the claim with the necessary suitable documents made to the Brazil Company, prior to its failure in February, 1893; that in December, 1889, the Atlantic Trust Company became a mortgagee of the steamship Allianca and the other property of the said steamship company, as security for the bonds of the company issued to the amount of $1,250,000, which were thereafter negotiated and are still outstanding; and that at the time of the execution of said mortgage and the issue of bonds, the trust company, and the owners of the bonds secured by the mortgage had no knowledge of the jettison above stated; that the libel herein was filed on the 30th of June, 1894.

Although the Allianca and the steamship company, her owner, were not liable for the act of jettison itself, (Lawrence v. Minturn, 17 How. 100,) the ship remained bound to contribute its proper share of average, as the same should be afterwards properly and legally adjusted, so as to indemnify the owner for the property that had been lawfully jettisoned for the common benefit of ship and cargo. The pro rata share thus legally charged against the ship in general average, became also a maritime lien upon her, in favor of the owner of the turpentine, and of the libelant, by subrogation. Dupont v. Vance, 19 How. 162, 168–172. It has also been adjudged that had the master upon the arrival of the ship at the foreign port neglected to take a proper average bond from the cargo owners in the interest of the property jettisoned, whereby the remedy of the owner of the property jettisoned might be lost or imperiled, such an omission would be a breach of a maritime duty owed by the master to the property jettisoned, which would make the ship responsible for the shares payable by the cargo. See Heye v. The North German Lloyds, 33 Fed. 60, and cases there cited. Strang v. Scott, 14 App. Cas. 606; Crooks v. Allan, 5 Q. B. Div. 38, 42.

There was no such neglect, however, in the present case. The average bond was taken, and the shares payable by the cargo were some time afterwards collected by the carrier company for the benefit of those interested. As respects this part of the claim, plainly there was not originally any lien upon the ship. Each was chargeable only for its pro rata share (Strang v. Scott, supra); and there was no breach of duty by the master in the delivery of the goods saved, since a proper bond was taken, and the ship's duty was thereby wholly performed as respects the cargo delivered. I do not think the long-subsequent collection of average by the ship owners from the consignees created

any new and additional lien on the ship for the cargo's share; or that it made the ship, in effect, a guarantor of the continued solvency of the steamship company for the libelant's benefit. I cannot find, therefore, that any lien ever attached upon the Allianca in respect to the shares of average payable by the cargo, and afterwards collected by the steamship company; and I therefore cannot sustain any claim against the proceeds of the Allianca for the share of the general average paid by the cargo owners to the Brazil Company.

As respects the ship's share of the general average charge, viz., the sum of $264.80, it is contended by the counsel for the trust company that the lien of the libelant has been lost by laches. But I do not think the circumstances are sufficient to sustain this contention. Although the jettison that gave rise to the lien happened before the mortgage was executed, the average was not adjusted, nor was any claim upon the ship capable of enforcement, until nearly a year and a half after the mortgage was given. Up to that time the lien was inchoate only, and there were no laches.

In the several cases cited on behalf of the mortgagee, the lien was perfected and capable of enforcement before the mortgage was given, which was not the case here. See The Bristol, 11 Fed. 156, and cases there cited; The C. N. Johnson, 19 Fed. 782; The Theodore Perry, Fed. Cas. No. 13,879. From the time the average adjustment was perfected until the failure of the company in February, 1893, was a year and about nine months. As regards this delay it is to be observed, that the final adjustment was in a distant port; that there had been great delay by the steamship company, first in preparing the adjustment in New York, and afterwards in Brazil in changing and completing it; that the libelant's claim had originally been forwarded to Brazil and presented with great promptness, and the bill of lading, as the proper voucher, sent there to substantiate the libelant's right; and the loss of the bill of lading seems ascribable in part to the great lapse of time before the average adjustment was completed; that there is no evidence of any notice to the libelant that the average adjustment had been completed until about May, 1892; and that the subsequent delay of nine months only, after the matter was resumed, is reasonably accounted for by the difficulty of dealing through agents at a distant point, and by the search for missing papers. There was not, in truth, any real delay, but rather a slow progress in the procurement of necessary vouchers.

Besides this, however, it does not appear that the trust company, mortgagee, can have been in the least prejudiced by the lapse of time. The general rule is that mere delay in the enforcement of a claim by a creditor gives no equity as respects other claimants, arising from subsequent insolvency or bankruptcy, provided the creditor has not himself done anything to mislead others. Davison v. Donaldson, 9 Q. B. Div. 623; Irvine v. Watson, 5 Q. B. Div. 414, 420; and see The Suliote, 23 Fed. 924, affirmed on appeal. There is no suggestion here that the mortgagee or bondholders have ever been misled; much less, that the libelant or the assured had done anything to mislead them. The defense here is that of mere delay in prosecution of a lien which could not be enforced until long after the mortgage was given. The

lapse of time is, I think, reasonably accounted for under all the circumstances of the case. The situation of the mortgagee cannot thereby have been changed or prejudiced in the least; nor is it conceivable that any different action would or could have been taken by the mortgagee or the bondholders, had they possessed perfect knowledge of this small lien and of its nonpayment; since the default by the steamship company in the payment of interest on the mortgage bonds on the 1st of January, 1892, some months anterior to the libelant's notice of the average adjustment, though the interest then due was a very large amount, led to no steps whatever by the bondholders or the mortgagee to enforce the mortgage, until after the company's failure. No case has been cited in which the delay under such circumstances has been held to discharge the lien.

Decree for the libelant for $264.80, with interest and costs.