THE ERNESTINA.

BRAVO et al. v. ST. PAUL FIRE & MARINE INS. CO.

(Circuit Court of Appeals, First Circuit.   June 18, 1919.)

No. 1382.

1. SHIPPING ☞196—HARTER ACT—JETTISONED CARGO.
   Harter Act, § 3, relating to liability of vessel owners, does not exonerate a vessel owner from liability for general average contribution in respect to cargo jettisoned.

2. SHIPPING ☞200—GENERAL AVERAGE—LIABILTY.
   A general average decree cannot be entered against vessel owners for items due cargo owners not parties to the record.

3. SHIPPING ☞200—GENERAL AVERAGE—AMOUNT OF DECREE.
   A general average decree, including items in favor of cargo owners not parties to the record, is not cured by the alleged failure of defendant shipowner to obtain security from such cargo owners or to have a general average stated.

Appeal from the District Court of the United States for the District of Porto Rico; Hamilton, Judge.

Libel by the St. Paul Fire & Marine Insurance Company against the schooner Ernestina; Arturo Bravo and others, claimants. Decree for libelant, and the claimants appeal. Affirmed as modified.

Frank Antonsanti, of San Juan, P. R., for appellants.

Oscar R. Houston, of New York City (D. Roger Englar and Harrington, Bigham & Englar, all of New York City, Henry G. Molina, of San Juan, P. R., and Edward E. Blodgett and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge.   This is an appeal by the owners of the schooner Ernestina from a decree of the District Court of Porto Rico holding the vessel liable for contribution in general average.

This vessel, seaworthy, properly manned, equipped, and supplied, sailed from San Juan, Porto Rico, November 27, 1917, laden with a general cargo of merchandise.   On the next day, by reason of a violent storm and north winds, the schooner sprung aleak, and the master found it necessary and duly ordered a portion of the cargo jettisoned in order to lighten the ship and save it, together with the passengers and crew, from being a total loss.   The vessel was saved.   On a general average for the loss of the jettisoned cargo a decree was made against the vessel in the sum of $1,213.53 on account of the schooner and $40 on account of the pending freight, a total of $1,253.53.

[1] The chief contention of the appellants is that section 3 of the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445, U. S. Comp. Stat. § 8029 et seq.) exonerates the vessel owner from liability for general average contribution in respect of cargo jettisoned, at least unless

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

there is some fault or negligence on the part of the owner or crew, or unless there is some express contract to contribute to general average.

Apart from the Harter Act no question is made that the schooner would have been liable in general average. Section 3 of that act is as follows:

"If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy, and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel, nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

The appellants would construe the language of this section so broadly as to exempt the owner, under the conditions stated, from loss of every kind arising from dangers of the sea or acts of God. The loss in this case was unquestionably due to a peril of the sea.

No case deciding this exact question is cited or found; but, on principle, and on the fair implications of the decided cases, we think the contention unsound.

In Carver's Carriage by Sea (6th Ed.) § 103f, it is said that section 3 of the Harter Act does not "affect the obligation of the shipowner to contribute in general average to sacrifices of cargo," citing The Allianca (D. C.) 64 Fed. 871, a decision by District Judge Brown in the Southern District of New York in 1894. The questions chiefly discussed in that case did not arise under section 3 of the Harter Act; but the construction stated by this text-writer seems to have been assumed.

There is nothing to indicate that this construction has not been generally accepted by the admiralty bar during the 25 years since this decision. Such acquiescence would be an adequate reason for the absence of more plainly applicable and conclusive decisions.

The Harter Act is entitled "An act relating to navigation of vessels, bills of lading, and to certain obligations, duties, and rights in connection with the carriage of property." General average is not mentioned expressly or impliedly in its title.

It first came before the Supreme Court in the case of The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771, decided March 2, 1896. That case arose out of a collision in New York Harbor between a tug and the steamship Delaware. The steamship was held solely at fault (D. C.) 61 Fed. 525, but claimed to be absolved from liability by section 3 of Harter Act. On page 470 et seq. of 161 U. S. (16 Sup. Ct. 516, 40 L. Ed. 771) the court by Mr. Justice Brown discussed the act, saying that this was the first case in which it had been called to the court's attention. After stating the substance of the six sec-

tions of the act, the court said (161 U. S. 471, 16 Sup. Ct. 522, 40 L. Ed. 771):

"It is entirely clear, however, that the whole object is to modify the relations previously existing between the vessel and her cargo. This is apparent, not only from the title of the act, but from its general tenor and provisions, which are evidently designed to fix the relations between the cargo and the vessel, and to prohibit contracts restricting the liability of the vessel and owners in certain particulars connected with the construction, repair, and outfit of the vessel, and the care and delivery of the cargo. The act was an outgrowth of attempts, made in recent years, to limit, as far as possible, the liability of the vessel and her owners, by inserting in bills of lading stipulations against losses arising from unseaworthiness, bad stowage, and negligence in navigation, and other forms of liability which had been held by the courts of England, if not of this country, to be valid as contracts, and to be respected even when they exempted the ship from the consequences of her own negligence. As decisions were made by the courts from time to time, holding the vessel for nonexcepted liabilities, new clauses were inserted in the bills of lading to meet these decisions until the common-law responsibility of carriers by sea had been frittered away to such an extent that several of the leading commercial associations, both in this country and in England, had taken the subject in hand and suggested amendments to the maritime law in line with those embodied in the Harter Act. The exigencies which led to the passage of the act are graphically set forth in a petition addressed by the Glasgow Corn Trade Association to the Marquis of Salisbury and embodied in a report of the Committee on Interstate and Foreign Commerce of the House of Representatives. As a part of the history of the times, this is a proper subject of consideration."

Then follows a long quotation from this report to the effect that steamship lines taking advantage of their practical monopoly have, through unreasonable and unjust provisions in bills of lading, exempted themselves from almost every conceivable risk and responsibility as carriers of goods. Of abuses thus originating several examples are given.

The court also said.

"The general words of the third section, * * * if detached from the context and broadly construed as a separate provision, would be susceptible of the meaning claimed, but when read in connection with the other sections, and with the remainder of section 3, they show conclusively that the liability of a vessel to other vessels with which it may come in contact was not intended to be affected.

"The first, second, fourth, and seventh sections deal exclusively with bills of lading and their covenants, and the third section, after using the general language relied upon by the respondent here, with regard to nonliability for faults or errors in navigation or in the management of the vessel, contains a further exemption of 'loss arising from dangers of the sea, or other navigable waters, acts of God or public enemies, or the inherent defect, quality or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or from loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to safe life or property at sea, or from any deviation in rendering such service.' These provisions have no possible application to the relations of one vessel to another, and are mainly a re-enactment of certain well-known provisions of the common law applicable to the duties and liabilities of vessels to their cargoes. The fact, too, that by section 6 the various sections of the Revised Statutes, which embody the limited liability act, are preserved unimpaired, would seem to indicate that the later act was not intended to receive the broad construction claimed."

If, in The Delaware, the court had adopted the broad literal construction of section 3 that we are now asked to place upon it, a reverse result would have been reached. The words of section 3, providing that the owner who has shown due diligence shall not "be held responsible for damage or loss resulting from faults or errors in navigation," might be construed broadly enough to cover damage done by a collision resulting from errors in navigation; but the court did not put this broad literal interpretation upon the act. This decision is nearly, perhaps quite, conclusive against the appellants' contention. Cf. The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; Crooks & Co. v. Allan, 5 Q. B. D. 38, 40; Schmidt v. Royal M. S. S. Co., 45 L. J. (Q. B.) 646.

In The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181 (May 18, 1898), the Supreme Court held that the Harter Act did not of itself relieve the shipowner from liability for unseaworthiness, even though he had in fact exercised due diligence to make his ship seaworthy. The court reaffirmed the doctrine of The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644, to the effect that exceptions in a bill of lading, if possible, ought to receive "a construction not nullifying or destroying the implied obligation of the shipowner to provide a ship proper for the performance of the duty which he has undertaken." The act was thus rather strictly construed.

Compare also Carver's Carriage by Sea, § 103f; The Chattahooche, 173 U. S. 540, 19 Sup. Ct. 491, 43 L. Ed. 801; The Kensington (D. C.) 88 Fed. 331; Id., 94 Fed. 885, 36 C. C. A. 533; Id., 183 U. S. 263, 22 Sup. Ct. 102, 46 L. Ed. 190; The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65.

The next important decision after the Delaware was The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130 (May 1898).

The owner of the Irrawaddy had exercised due diligence to make his vessel in all respects seaworthy and properly manned, equipped, and supplied. She was stranded by the negligence of her master. Thereafter there was jettison of a portion of her cargo, as well as sacrifices and losses incurred by her owner in order to save the ship and cargo. The contention of the owner was that, on general average, he was entitled to contribution for the sacrifices made by him in these successful efforts to save vessel, freight and cargo.

This contention was not sustained. The court said by Mr. Justice Shiras (171 U. S. 192, 18 Sup. Ct. 833, 43 L. Ed. 130):

"Plainly the main purposes of the act were to relieve the shipowner from liability for latent defects, not discoverable by the utmost care and diligence, and, in event that he has exercised due diligence to make his vessel seaworthy, to exempt him and the ship from responsibility for damage or loss resulting from faults or errors in navigation or in the management of the vessel. But can we go further, and say that it was the intention of the act to allow the owner to share in the benefits of a general average contribution to meet losses occasioned by faults in the navigation and management of the ship."

The first part of the above quotation must, of course, be construed in the light of the decision just before made in The Carib Prince, supra, and the subject-matter to which it related. So construed, it means that the Harter Act empowers the shipowner by contract to relieve

himself from liability for latent defects not discoverable by due diligence.

Certainly in this decision the court showed no disposition to extend the operation of the act beyond its plainly necessary application.

In the case of The Strathdon, a closely analogous question arose before the District Court for the Eastern District of New York, in April, 1899 (94 Fed. 206), District Judge Thomas held that the fire loss then in question was due to the negligence of the crew, that although, under section 3 of the Harter Act, the owners were exempt from liability for damage to the cargo resulting from a fire due to the negligence of the crew, yet that the shipowners could not maintain affirmative action against the cargo owners for contribution in general average to the ship's loss. Also that when the ship's owners were invited to such an adjustment by the cargo owners, the ship's loss must be taken into consideration, as the effect of excluding it would be to make the same act for which the vessel owners are acquitted of responsibility by the statute the basis of an indirect recovery for part of the damage. which was in issue in the direct action. Judge Thomas said:

"It is true that under the Irrawaddy Case the carriers could not affirmatively demand contribution, because, notwithstanding the exculpation from the payment of damages for the loss of cargo accorded them by the fire and Harter acts, they are deemed guilty of constructive negligence when they seek to recover contribution for the ship's losses. But this imputed negligence does not exempt them from an action for contribution in general average at the instance of the cargo owner for cargo loss. The cargo owner has such action if the carriers be free from such imputed negligence; and can it be asserted logically that the carriers, when free from negligence, are liable to the cargo owners, but that this liability is discharged because the carriers are negligent, and such negligence caused the loss? According to such a contention, it is better to be negligent than unoffending. By it the carrier may plead his own wrong to escape an obligation that would be due from him, if he were without fault."

In the Court of Appeals (Wallace, Lacombe and Shipman) this part of Judge Thomas' decision was sustained (101 Fed. 600, 604, 41 C. C. A. 515), although that court held (for present purposes immaterial) that the District Court was in error in its view that the fire was caused by negligence of the crew. There is nothing in this case supporting the appellant's contention.

The only other leading case in which the courts have discussed the effect of the Harter Act upon general average is that of The Jason, which was, as to the facts, practically on all fours with the Irrawaddy Case, except that in the case of The Jason the bills of lading provided in effect that if the shipowners "shall have exercised due diligence to make said ship in all respects seaworthy, and properly manned, equipped, and supplied," then in case of danger, damage, or disaster resulting from (inter alia) negligent navigation, the cargo owners shall not be exempted from liability for contribution in general average, but with the shipowner shall contribute as if such danger, damage, or disaster had not resulted from negligent navigation. The case originated in the District Court for the Southern District of New York, and Judge Hough wrote an able and interesting opinion (162 Fed. 56), discussing the application of section 3 of the Harter Act, holding that

it did not affect the right of the cargo owner to general average contribution from the vessel. In the Court of Appeals for the Second Circuit (178 Fed. 414, 101 C. C. A. 628), the court (Lacombe, Coxe and Ward) held that section 3 is not to be construed so broadly as to entitle a vessel owner to collect a general average contribution from the cargo owner on account of expenditures incurred for the salvage of vessel and cargo after stranding through faults and negligence in navigation, and that a provision in the bills of lading giving it such right is invalid. The case was then certified on certain questions to the Supreme Court (225 U. S. 32, 32 Sup. Ct. 560, 56 L. Ed. 969), where it was decided in May, 1912. The Supreme Court held the provision in the bill of lading entitling the vessel owner under such circumstances to claim contribution in general average to be valid.

The court by Mr. Justice Pitney said:

"Prior to the Harter Act it was established that a common carrier by sea could not by any agreement in the bill of lading exempt himself from responding to the owner of cargo for damages arising from the negligence of the master or crew of the vessel. Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 438 [9 Sup. Ct. 469, 32 L. Ed. 788], following New York C. Railroad Co. v. Lockwood, 17 Wall. 357 [21 L. Ed. 627]."

But the court held that the public policy underlying these decisions was subject to change by Congress, saying:

"In our opinion, so far as the Harter Act has relieved the shipowner from responsibility for the negligence of his master and crew, it is no longer against the policy of the law for him to contract with the cargo owners for a participation in general average contribution growing out of such negligence; and, since the clause contained in the bills of lading of The Jason's cargo admits the shipowner to share in the general average only under circumstances where by the act he is relieved from responsibility, the provision in question is valid, and entitles him to contribution under the circumstances stated."

Mr. Justice Pitney states the result of the Irrawaddy decision as follows:

"The point of the decision in The Irrawaddy (and as an authority the case goes no further) is that while the Harter Act relieved the shipowner from liability for his servant's negligence, it did not of its own force entitle him to share in a general average rendered necessary by such negligence."

In both these leading cases—The Irrawaddy and The Jason—the discussion turned in large part upon the effect of the Harter Act in changing the public policy of the nation concerning contracts limiting the liability of carriers for the negligence of their servants. Compare The Southwark, 191 U. S. 1, 6, 24 Sup. Ct. 1, 48 L. Ed. 65. But neither case presented the exact question now involved of the right to general average by the cargo owner against the vessel owner for loss suffered from a peril of the sea or from an act of God, exemption from which (on the part of the carrier) by contract was never obnoxious to the public policy of the United States as declared by the earlier decisions of the court. See The G. R. Booth, 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234, and cases cited.

Clearly, the chief purposes of the Harter Act were to authorize or effect substantial changes in the relations between vessel owners as

common carriers and cargo owners as shippers. But we are unable to believe that this act was intended to work a radical change in the relations of coadventurers arising out of a voluntary sacrifice in the common interest in order to save the ship and remaining cargo from a peril of the sea or from an act of God. The general principles underlying general average seem to us to put such a case as the one at bar, where no negligence, actual or imputable, is involved, outside the scope of the Harter Act. Ralli v. Troop, 157 U. S. 386, 15 Sup. Ct. 657, 39 L. Ed. 742. We find it impossible to believe that Congress intended to make it possible for the captain of a ship to sacrifice all or a large part of the cargo in order to save his ship, without any obligation on the part of the saved ship to contribute to the loss of the cargo owner. Only plain and unmistakable language would warrant a court in inferring a legislative purpose so inconsistent with the fundamental principles both of general average and of common carrier duty.

The decision of the court below that the Harter Act has no application to this case must be affirmed.

[2] The appellant's third assignment of error is as follows:

"The court erred in rendering a decree for the full amount claimed in the libel, because the testimony conclusively showed that the libelant had charged in its general average statement items which, if due at all, were admitted to be due to other parties who were not litigants in the cause or represented therein."

Although the record is, on this point, not as clear and satisfactory as it should be, we think the appellant's contention must be sustained.

In its libel the appellee contends that "as an insurer of a part of the cargo jettisoned it was obligated to pay, and has paid, the sum of $2,063.63." The libelant's witnesses testified that "the ship would be liable for about 25 per cent. of that sum, or $440." The difference between this sum of $440 and the amount $1,253.50, for which the court below entered a decree against the vessel is claimed to accrue for the benefit of other cargo owners, not parties to this record. There is nothing in this record indicating that these other cargo owners make any claim, or to show that the appellant may not have, by private negotiation, already adjusted with them.

[3] In effect the appellee's counsel admit that this contention is well based, and that "the libelant can only recover the contribution due in respect of its own interests, and cannot recover contribution in this suit which belongs to other cargo owners or underwriters." But the appellee claims that this error is more than offset by another alleged error in favor of the appellants. This alleged offsetting error consists in the failure of the shipowners to take proper steps to obtain security from the cargo owners, or to have a general average stated. While such failure on the part of the shipowners might ground a claim in favor of any cargo owners injured thereby, it has no bearing upon the appellants' contention that in this case a decree cannot be made in favor of parties not in court. See Carver on Carriage of Goods by Sea, § 42; Crooks & Co. v. Allan, 5 Q. B. D. 38; The Santa Ana, 154 Fed. 800, 84 C. C. A. 312.

Even this contention of the appellee's is apparently not insisted upon, for counsel in their briefs say:

"The appellee, however, does not press its right to affirmative relief because of the fact that the other cargo owners were all domiciled in Porto Rico and can probably be made to respond to their respective proportions of general average without serious difficulty."

The third assignment of error must be sustained. The decree below should be modified by substituting the sum of $440 for the sum of $1,253.50, and, so modified, it may be affirmed, with costs to the appellants in this court.

The decree of the District Court is modified by substituting the sum of $440 for the sum of $1,253.50, and, so modified, is affirmed; and the appellants recover costs in this court.