## THE MARY F. BARRETT.

(Circuit Court of Appeals, Third Circuit. March 24, 1922. Rehearing Denied May 9, 1922.)

No. 2746.

1. **Shipping ⬤197—Jettison of part of cargo is "peril of the seas."**

   The necessary jettison of a part of the cargo to save the ship and the rest of the cargo from imminent danger is one of the perils of the seas, within a clause of the bill of lading excepting liability for such perils.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.]

2. **Shipping ⬤186—Essentials for general average contribution stated.**

   The three requirements to make jettison of part of cargo a proper basis on which to claim general average contribution are a common imminent peril, a voluntary sacrifice, and a successful termination, and the right to such contribution does not depend upon any question of negligence, but is established by the law itself.

3. **Shipping ⬤193—Master is agent of cargo owner in jettisoning part of it.**

   The master of a ship which is in imminent peril is the agent, not only of the ship, but of the owners of the cargo, with authority to decide what part of the cargo should be jettisoned, and to give the owners' consent to such jettisoning, so as to establish the voluntary sacrifice by the owner, which is one of the essentials to a right to general average contribution.

4. **Shipping ⬤190—Saved cargo is liable to general average for jettison necessitated by negligent navigation.**

   The portion of the cargo which was saved by jettison of the rest is liable for general average contribution to that portion of the cargo lost, even though the jettison was made necessary by the negligent navigation of the vessel.

5. **Shipping ⬤190—Negligent navigation does not impose on vessel liability of saved cargo for general average; "responsible."**

   The fact that the imminent peril which necessitated the jettison of part of the cargo was occasioned by the negligent navigation of the vessel does not entitle the saved cargo to have transferred to the vessel its liability to the lost cargo for general average contribution, since, within Harter Act, § 3 (Comp. St. § 8031), providing that a vessel shall not be responsible for errors in navigation, the term "responsible" means answerable, legally or morally, for the discharge of a duty, trust, or other obligation, accountable, and to charge the vessel with liability for such general average contribution would make it responsible for what the Harter Act stated it should not be held responsible.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Responsible.]

---

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Shipping ⬤⟿190—To make negligent navigation a defense, to contribution in general average by the saved cargo would destroy master's impartiality.**

A rule that, if the imminent peril which necessitated the jettison of part of the cargo resulted from negligent navigation, the liability of the saved cargo to the lost cargo for general average contribution should be transferred to the vessel, would destroy the impartiality of the master in determining the necessity of jettisoning part of the cargo and the selection of the portion to be jettisoned.

**7. Shipping ⬤⟿195—Share of master in vessel is liable for errors in navigation.**

A share in a vessel owned by the master is liable to the cargo for jettison of a portion thereof, made necessary by the master's errors in navigation.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Libel by the American Dyewood Company against the schooner Mary F. Barrett, whereof H. T. Hayden is master and part owner. Decree for libelant (270 Fed. 618), and respondent appeals. Reversed and remanded, with instructions.

Howard M. Long, of Philadelphia, Pa., for appellant.

Harrington, Bigham & Englar, of New York City, and Conlen, Brinton & Acker, of Philadelphia, Pa. (William J. Conlen and J. Thurston Manning, Jr., both of Philadelphia, Pa., of counsel), for appellee.

Harrington Putnam, of New York City, amicus curiæ.

Before BUFFINGTON, Circuit Judge, and THOMSON and WITMER, District Judges.

BUFFINGTON, Circuit Judge. This case can be best approached by an initial statement of its pleadings and a definition of the issues raised thereby. The libel was filed by the American Dyewood Company against the schooner Mary F. Barrett. Libelant alleged its charter of the schooner, delivery to the latter of a cargo of logwood, issue of a bill of lading, and the failure of the schooner "to deliver all of the libelant's cargo, pursuant to the terms of the said bill of lading and the said charter party." It will thus be seen the libel was based on contract, not on tort, or any alleged negligence or fault of navigation, and not only is no question of negligence raised by the libel, but it is quite evident that in view of the Harter Act (Comp. St. §§ 8029–8035), relieving the ship and owner from liability for the negligence of the ship's officers, we are justified in concluding that, by bringing the form of action the libelant did, it purposely eliminated from the issue all question of negligence and rested its rights and the liabilities of the defendant wholly on the contractual obligations of the charter party. So viewing this libel, the ship answered, averring that the charter party provided, "The dangers of the sea and navigation of every kind and nature always mutually excepted," and the bill of lading, "The act of God, the king's enemies, fires and all and every other dangers and accidents of the seas, rivers and navigation, of whatever nature or kind soever excepted," and that by virtue of such exceptions in the contract, the ship was not answerable because it had been stranded on a reef, and the part of the cargo undelivered had been lawfully jettisoned in

order to float the schooner and save the remainder of the cargo and the ship itself from total loss.

[1] It will thus be seen that, under the averments of the libel and the answer of the ship, the case resolved itself into a question of law, namely, whether the contracted for exceptions noted above in the charter party and bill of lading, and the lawful jettison of the missing part of the cargo, relieved the ship from the failure to deliver such jettisoned part. On that question, we think the law of the sea subjects each part of the venture to sacrificial liability, if such sacrifice becomes necessary, to save the other parts of the venture, and because this obligation is imposed by law and accepted by participation in the venture, it follows, as a matter of fact and a sequence of law, that jettison of one part of the venture for the salvation of the residue of the venture is a danger of the sea, and therefore is one of the exceptions which under the present contract, as well as under the principles of maritime law, relieved the vessel from contractual liability. From these considerations, it follows, therefore, that the defense of lawful jettison was not only one which the parties expressly wrote into their contract, but was also an exception which the maritime law imposes on every part of the joint venture on which ship and cargo embark.

Such being the case, the libelant not being entitled to recover for the jettisoned cargo, the libel could properly have been dismissed, for, as said in Lawrence v. Minturn, 17 How. (58 U. S.) 111, 15 L. Ed. 58:

"There can be no doubt that a loss by jettison, occasioned by a peril of the sea, is a loss by a peril of the sea. In that case the sea peril is deemed the proximate cause of the loss."

But the jettison of part of its cargo, being in this case in relief of the ship, it would then have been the right of the owner of the jettisoned cargo to bring suit in general average against the saved ship and the saved cargo. But, instead of dismissing the case and necessitating the bringing of this new suit, the court below in effect turned the plaintiff's case into one of general average on its part, apparently with the consent of both parties, for in its answer the schooner had set forth:

"Said jettison constitutes an act of general average, and that such loss, together with the sacrifices made by said schooner in freeing herself from said impending danger, were general average losses, and that said stranding was occasioned by the peril and danger of the sea which perils and dangers are duly excepted in the charter party aforesaid, and in the bill of lading issued for said cargo"

—and treated the case as though the suit was one brought by the libelant for general average contribution.

[2] Now, of the right of the lost cargo owner to maintain such an action against the saved ship and the saved cargo there can be no doubt, for clearly the situation met the three requirements of law which make jettison a proper basis on which to claim general average contribution, namely, where there was, first, a common imminent peril; second, a voluntary sacrifice; and, third, a successful termination. See 36 Cyc. 373, and cases cited.

The case then becomes one of general average, in which the plaintiff is the jettisoned part of the cargo and the defendants are the saved

ship and the saved cargo. Moreover, it will be observed that the right of the lost cargo against the saved ship and the saved cargo, as fixed by the pleadings, neither involved nor even suggested any question of negligence; but the law itself based the action of general average, not on tort or contract, but on the three legal requisites to jettison above mentioned, namely: (a) A common imminent peril; (b) a voluntary sacrifice; and (c) a successful termination.

[3] That the whole venture, stranded on the reef, was in the face of imminent peril, and of the further fact that the jettison was successful in saving the ship and the rest of the cargo, there is no question. It remains, therefore, to inquire whether the lost cargo made a voluntary sacrifice of itself, to save the ship and the rest of the cargo. In view of the fact that the owner of the lost cargo was not present and consenting to the jettison, and that such jettison was made by the master of the ship, it follows that, unless it be shown that the master, in making the jettison, acted as the agent of the plaintiff lost cargo, and evidenced the voluntary sacrifice thereof by the lost cargo owner in the face of a common imminent danger, the lost cargo owner has no claim for contribution in general average. This brings us face to face with the question of the relation, in case of imminent peril, of the master to the jettisoned part of the cargo: Did the law make him the agent for the absent cargo owner? If so, did the law, in creating him, in the face of imminent peril, the agent of the absent cargo owner, in forcing that agency upon the latter, and intrusting that agent with the high responsibility of the cargo owner through such agent, then making a voluntary sacrifice of itself for the common good? And to go further, did the law, in thus creating this imposed agency, itself hold out no inducement or temptation to swerve the agent it appointed from the stewardship of disinterested agency?

Turning to the first question, we inquire: Did the law, in the face of the imminent peril, make the master of the ship the agent of the lost cargo owner to determine and if necessary make the voluntary sacrifice for the common good? The law leaves no doubt on that point. The existence of a necessity for jettison sacrifice made the master the agent of every part of the venture, and if sacrifice of any part of it became necessary to save the residue, the law made the master the agent of the sacrificial part, and empowered him to make a voluntary sacrifice thereof for the jettisoning owner, and at the same time the law made the master the agent of the remaining parts of the venture, to obligate them to contribute in due proportion to reimburse his sacrificing principal. That, as we gather, is the law of the sea, and the judgment of courts, and the opinion of text-writers.

Turning to modern cases, we find the origin, and the principles of general average, aptly stated in the Seventh Circuit case of The Roanoke (1893) 59 Fed. 162, 163, 8 C. C. A. 69, where it is said:

"The rule for contribution in general average is older than, and entirely aside from, the common law—is a rule both of equity and policy, which has come down through the centuries from an old Rhodian law, adopted in the Roman jurisprudence. and thence entered into the general maritime law. It appears to have been preserved in England without enforcement by statute. It applies only to shipping, and prescribes that in all cases of imminent peril

to the whole adventure, where release is obtained by intentional sacrifice of any part for the benefit of the residue, contribution shall be made by the saved portions for that which was so sacrificed. The common peril takes from the master of the vessel his paramount obligation to his vessel owners, and charges him with a joint agency for the owners of cargo and vessel, to act impartially, decide when a sacrifice is necessary, and select for sacrifice that which will best serve the interest of all to avoid the peril. This general average contribution is not dependent upon contract, but is 'built upon the plainest principles of justice' (3 Kent, Comm. 233), and is aside from contract (The Eagle, 8 Wall. 23): 'It is the safety of the property, and not of the voyage, which constitutes the true foundation of general average.' Insurance Co. v. Ashby, 13 Pet. 331. The vessel is made to contribute, as well as the cargo saved, not because of its undertaking to carry, or out of any duty as carrier, but because it had encountered peril, and had been saved to the owners by a sacrifice of other property."

To the same effect was the case of Ralli v. Troop, 157 U. S. 400, 15 Sup. Ct. 662, 39 L. Ed. 742, where the Supreme Court in 1894, said:

"Whether the master is considered as acting under an implied contract between the owners of the vessel and the shippers of the cargo, or as the agent of all from the necessity of the case, or as exercising a power and duty imposed upon him by the law as incident to his office—whatever may be considered the source of his authority—the power and the duty of determining what part of the common adventure shall be sacrificed for the safety of the rest, and when and how the sacrifice shall be made, appertain to the master of the vessel, magister navis, as the person intrusted with the command and the safety of the common adventure, and of all the interests comprised therein, for the benefit of all concerned, or to some one who, by the maritime law, acts under him, or succeeds to his authority."

The foregoing views of our American courts are in accord with the English authorities, of which, as an example, we refer to Burton v. English, 12 Q. B. D. 223, where it is said:

"This claim for safety contribution, at all events, is part of the law of the sea, and it certainly arises in consequence of any act done by the captain as agent, not for the shipowner alone, but also for the cargo owner, by which act he jettisons part of the cargo on the implied basis that contribution will be made by the ship and by the other owners of cargo. He makes the sacrifice on behalf of one principal, whose agent of necessity he is, on the implied terms, if you like to call it so, that that principal shall be indemnified afterwards by the rest."

Seeing, then, that the master acted in this case as the agent of the plaintiff cargo owner in making jettison sacrifice, and as the agent of the defendant ship and the agent of the defendant saved cargo in accepting the jettison sacrifice for the benefit of the saved ship and the saved cargo, the owner of the sacrificed cargo has established its right to call on the ship and the rest of the cargo, to contribute each one's ratable proportion to reimburse the sacrifice made. To this call the defendant ship answers by consent to pay its proportion of the sacrifice. But to this call the balance of the cargo answers and says in substance, we will not contribute our proportion of the sacrifice, first, because we are relieved of that responsibility by reason of the negligence of the master; and, secondly, because, if we are primarily liable for this contribution, the court having before it all parties, will impose on the ship this primary liability on our part.

[4] Turning to the first question, namely, freedom on the part of

the saved cargo owner from liability to the sacrificed cargo in case of negligent navigation of the ship, the authorities are against it, of which Strang v. Scott, 14 App. Cases, 601, is an example:

"The owners of goods thrown overboard, having been innocent of exposing the Abington and her cargo to the sea peril which necessitated jettison, their equitable claim to be indemnified for the loss of their goods is just as strong as if the peril had been wholly due to the action of the winds and waves."

[5] Seeing, then, the right of the lost cargo plaintiff is established against the saved cargo defendant, we next inquire by what principle of law is this liability of the saved cargo to the lost cargo transferred to and fastened upon the ship, in addition to the ship's pro rata share in contribution, which it concedes; in other words, can this proceeding in contribution on general average, so far as this additional claim against the ship is concerned, be turned into a third action, namely, in tort? It will, of course, be noted, as we before said, that no question of negligence of the ship has been put in issue by the pleadings; but, assuming for present purposes the ship's prior negligence was in issue and is established, we then have a situation where, if the saved cargo's contention be sustained and its primary liability for pro rata contribution is transferred to and ultimately imposed on the ship, it necessarily follows that a ship which has used "due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied" is nevertheless held "responsible for damage or loss resulting from failure and error in navigation," when Harter Act, § 3 (Comp. St. § 8031), provides that such seaworthy ship shall not be held—

"responsible for damage or loss resulting from faults or errors in navigation or * * * for losses arising from dangers of the sea * * * or from saving or attempting to save * * * property at sea."

Indeed, to thus hold the seaworthy ship liable for the master's negligence, it seems to us is to shear every vestige of immunity granted by the Harter Act to the shipowner, who has furnished a seaworthy vessel, and it can only be done by a dubious judicial reading into the act by construction what the enacted plain words of the act neither require nor permit. The significant word in that act is "responsible," which means to respond, and "respond" means to answer. The Century Dictionary defines "responsible" as:

"Answerable, legally or morally, for the discharge of a duty, trust, debt, service or other obligation; accountable, as to a judge, master, creditor, ruler, or rightful superior, subject to obligations; bound."

It will thus be seen that, in freeing the ship from responsibility for the negligence of the master, the Harter Act was not, as held by the Supreme Court, conferring on the ship a new right or some new power, but it simply relieved the ship from an obligation which then rested upon it, namely, to respond, to answer, to be accountable, for the negligence of the master. That is what the express language of the act is—not "responsible." That is, when it was attempted to make the ship responsible for the negligence of the master accountable for the negligence of the master in all of these cases, the act said to the ship: If

you have used "due diligence to make said vessel in all respects seaworthy and properly manned, equipped, and supplied," the ship or its owners shall not "be held responsible"—that is, answerable, accountable, liable—"for damages or loss resulting from faults or error in navigation." In the face of this plain meaning of a plain English word, used in the law, there is no room or call for judicial construction. The law, plainly read, relieved the ship from responsibility for the master's negligence when by legal proceedings it was sought to make the ship responsible for such negligence. And this construction of the Harter Act has for its support the Second Circuit case of The Strathdon (D. C.) 94 Fed. 212 (decided in 1899), and then summed up in these three propositions:

"3. The cargo owner cannot, under the guise of an action for contribution in general average, recover upon the basis of the shipowner's alleged constructive negligence a portion of the damages, which upon the same alleged grounds he could not recover in a direct action.

"4. While the shipowner, freed from liability by the statutes, may not invoke an action for general average adjustment, to obtain payment of his own losses, the cargo owner may do so; but, as the statutes prevent his recovering any damages based upon the shipowner's alleged negligence, the cargo owner may not, in the adjustment invoked by him, derive any benefit from such alleged negligence.

"5. In such case the usual rule of reciprocity of right and obligation exists, and the adjustment should be made as if there was no negligence in the case, there being none in fact on the part of the owners."

The affirmance of that case in 101 Fed. 603, 41 C. C. A. 515, and the general practice that has since that time been followed, is evidenced in the standard work on General Average by Congdon, himself an experienced adjuster, who (page 43) says:

"3. If they are made by both vessel and cargo, the shipowner cannot invoke a general average adjustment, but the cargo owner may do so. In the latter case the shipowner is entitled to have the vessel's sacrifices and extraordinary expenditures included in the adjustment, and the cargo owner can only recover the balance, if any, which the adjustment may show in his favor. If the adjustment should show a balance in favor of the shipowner, the latter cannot collect it from the cargo owner, as his own sacrifices and losses cannot be used further than to offset the cargo owner's claim."

Moreover, back of The Strathdon and acquiescence therein for 20 years, and of this present and other supporting decisions, stand the practical consequences that would ensue when the question of jettison confronted the master, in case the Harter Act be given the construction here contended for by the saved cargo.

[6] In the face of imminent danger, the law, as we have said, makes the master the agent of every part of the whole venture, to determine the question whether the sacrifice of any part may save the others. The law having thus made the captain the agent of all, it follows that the law must make him an impartial agent; for it is evident that, if this law-imposed agent is by the law itself so fettered with partiality that if by doing nothing he can shield the ship from responsibility, and by acting he imposes responsibility on the ship, the law has created an agent whose bias unfits him for his work. If the ship is seaworthy, and fault of navigation has, as in the present case, placed her on the rocks,

and the master knows the ship is by the Harter Act not responsible for his negligence, what but a biased mind can the master bring to deciding the question of jettison, if the law be that such jettison, if made, will subject the ship to pay the jettison loser in full, because of the fault which stranded the ship? Such a construction would shear the master of the spirit of impartiality, fill him with the biased jaundice of interest, and unfit him to make the impartial sacrificial decision on which the safety of life, ship and cargo so often depend. It is only by rejecting such construction the law can inspire an impartial, disinterested master agent with that "honest intent to do his duty," which duty Justice Clifford bespoke for a master in The Star of Hope, 9 Wall. (76 U. S.) 203, 19 L. Ed. 638:

"Standing upon the deck of the vessel, with a full knowledge of her strength and condition, and of the state of the elements which threaten a common destruction, he can best decide in the emergency what the necessities of the moment require to save the lives of those on board and the property intrusted to his care; and if he is a competent master, if an emergency actually existed calling for a decision whether such sacrifice was required, and if he appears to have arrived at his conclusion with due deliberation, by a fair exercise of his own skill and judgment, with no unreasonable timidity, and with an honest intent to do his duty, it must be presumed, in the absence of proof to the contrary, that his decision was wisely and properly made."

With a deep sense of the responsibility of changing the law as we believe it is now construed by the American maritime world, and which we feel we would change in affirming the decree below, we are of opinion that the decree in this case, which made the ship responsible for the whole loss of the jettisoned cargo, must be reversed, and the cause should be remanded to the court below, with instructions to enter a decree charging the saved cargo and the saved ship in such due proportion as is customary in general average, without regard to any question of negligence.

[7] The navigation being at fault in this case, as the court below found and as we do, the share of the ship owned by the captain is, of course, not relieved of responsibility by the Harter Act.