### AMERICAN CREOSOTING CO. v. DEUTSCHE PETROLEUM AKTIEN GESELLSCHAFT et al.

### HAMBURGER TANKER GESELLSCHAFT v. AMERICAN CREOSOTING CO.

### THE MASSASOIT.

District Court, D. New Jersey. August 16, 1928.

Haight, Smith, Griffin & Deming, of New York City (Clarence B. Smith, of New York City, of counsel), for libelant.

Hatch & Wolfe, of New York City (Carver W. Wolfe, of New York City, of counsel), for claimant and cross-libelant.

RELLSTAB, District Judge. This is a libel by the American Creosoting Company against the steamer Massasoit and her owner, the Deutsche Petroleum Aktien Gesellschaft, respondent, to recover for damages alleged to have been sustained through the failure of the respondent to deliver 55,000 gallons of creosote oil. The Hamburger Tanker Gesellschaft, as claimant, filed a cross-libel to recover the amount of expenses alleged to have been incurred in removing the creosote and for detention of the steamer during the period of removal.

The full capacity of the Massasoit was chartered by the libelant to carry a cargo of creosote from Antwerp to the port of New York. Admittedly, this is a case of private, and not common, carriage. The respondent, therefore, was but a bailee to transport for hire. The G. R. Crowe (D. C. S. D. N. Y.) 287 F. 426 and cases cited; The Oakley C. Curtis (C. C. A. 2) 4 F.(2d) 979; The Nordhvalen (D. C. Md.) 6 F.(2d) 883; Warner Sugar Refining Co. v. Munson S. S. Line (D. C. S. D. N. Y.) 23 F.(2d) 194.

The terms of the charter, therefore, measure and determine the rights and obligations of the parties thereto. Its pertinent provisions are:

"(1) The said steamer shall be fitted at the expense of the owners with the necessary steam-heating apparatus, the creosote to be kept heated at 90° to 100° F. continuously during the voyage and in a fit state for ready discharge on arrival at destination. * * *

"(2) The said steamship being tight, staunch, and strong, and every way fitted for the voyage, and to be maintained in such condition during the charter, perils of the sea excepted, shall, as ordered before sailing from discharging port, with all convenient dispatch, sail and proceed to one or two safe ports in the east coast of the United Kingdom and/or continent (Ostend-Hamburg range, inclusive) in charterer's option, or so near unto as she may safely get (and always afloat), and there load from the factors of the said charterers, a cargo of 6,000 tons 5 per cent. more or less, in owner's option, creosote oil (guaranteed to be fluid, free of pitch, and freely pumpable at a temperature not higher than 100° F.) in bulk, * * * and being so loaded shall therewith proceed * * * direct to a safe United States Atlantic port * * * and deliver the same. * * *"

"(6) The cargo shall be pumped into the steamer at the expense of the charterers and at the risk and peril of the charterers. * * * The cargo shall be pumped out of the steamer at the expense of the steamer, but at the risk and peril of the steamer only so far as the steamer's rail, into the consignee's pipe line or into lighters lying alongside. * * *"

"(11) The act of God, perils of the seas, rivers and navigations, * * * stranding and other accidents of navigation excepted, even when occasioned by negligence, default, or error in judgment of the pilot, master, mariners, or other servants of the shipowners. Ship not answerable for loss through * * * any latent defect in the machinery or hull not resulting from want of due diligence by the owners of the ship, or any of them, or by the ship's husband or management."

"(18) The owners in all matters arising under this contract shall also be entitled to the like privileges and rights and immunities as are contained in sections 2 and 5 of the Carriage of Goods by Sea Act 1924, and in article 4 of the schedule thereto."

"(21) The steamer shall not be accountable for leakage, nor for any consequences arising from charterers shipping different kinds or quantities of creosote oil."

The material parts of the Sea Act (English) and Schedule referred to in clause 18 of the charter are:

"Sec. 2. There shall not be implied in any contract for the carriage of goods by sea

to which the rules apply any absolute undertaking by the carrier of the goods to provide a seaworthy ship."

"Sec. 5. Where under the custom of any trade the weight of any bulk cargo inserted in the bill of lading is a weight ascertained or accepted by a third party other than the carrier or the shipper and the fact that the weight is so ascertained or accepted is stated in the bill of lading, then, notwithstanding anything in the rules, the bill of lading shall not be deemed to be prima facie evidence against the carrier of the receipt of goods of the weight so inserted in the bill of lading, and the accuracy thereof at the time of shipment shall not be deemed to have been guaranteed by the shipper."

Article 4 of the Schedules:

"1. Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness, unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped and supplied, and to make the hold, refrigerating and cool chambers and all other parts of the ship in which goods are carried fit and safe for their reception, carriage and preservation in accordance with the provisions of paragraph I of article III.

"Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other person claiming exemption under this section.

"2. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship. * * *

"(c) Perils, dangers and accidents of the sea or other navigable waters. * * *

"(i) Act or omission of the shipper or owner of the goods, his agent or representative. * * *

"(m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods. * * *

"(p) Latent defects not discoverable by due diligence.

"(q) Any other cause arising without the actual fault or privity of the carrier, or without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of

the carrier contributed to the loss or damage."

A cargo of about 6,000 tons (stated in the bill of lading as 6,019 tons) of creosote was pumped into the tanks of the Massasoit at Antwerp, commencing at 12:40 p. m., November 26, 1925, and ending at 1 a. m., November 28, 1925. On arrival at the port of New York on December 18, 1925, all the pumpable cargo was delivered into the libelant's shore tanks. Shortly thereafter it was discovered that there was 6 to 12 inches of sediment in the bottom, and an average of 2 inches thereof on the sides, of the Massasoit's tanks, the sediment being harder nearer the skin of the ship. This sediment (in weight about 135 tons), removable by manual labor only, and mainly with pick and shovel, was put on the decks of the Massasoit and delivery thereof tendered to the libelant, who refused it.

The respondent contends that this residue accounts for the total shortage, and libelant concedes that, except for it, there probably would have been no shortage. The libelant charges that this sediment, and the consequent nondelivery of all of the creosote put in at Antwerp, was due to the respondent's failure to keep it heated at 90° to 100° F. continuously. The respondent's answer admits the making of the charter party and the shipment of 6,000 tons, more or less, in apparently good order and condition, and denies any failure to deliver. It charges that the libelant has not proved that there was any shortage, and, in addition to alleging tender of delivery and refusal of libelant to accept, alleges that, if there was a failure to deliver all the oil, it was because it was not fluid, free of pitch, and freely pumpable at a temperature not higher than 100° F., or because of its inherent vice, or, if due to the failure to heat the oil to the required temperature during the entire voyage, it was occasioned by perils of the sea, or to the exceptions contained in clause 11 of the charter or the referred-to clauses in the English Carriage of Goods by Sea Act, any of which exceptions, as noted, would excuse respondent from liability.

By amendment to the answer, made at the trial, respondent also set up "general average" as a defense. It also contends that the failure of libelant to accept the tendered residue and minimize the loss disentitles it to recovery of any damages.

Under this charter, the burden is on the libelant to establish that the creosote oil was "fluid, free of pitch, and freely pumpable at a temperature not higher than 100° F. in

bulk," and that the respondent failed to deliver the quantity of oil intrusted to it. The obligations of the libelant will be first considered.

*First. As to the shortage claimed:* Respondent insists that libelant has not proved that it shipped the quantity of creosote stated in the bill of lading. For present purposes it is deemed sufficient to note that the large quantity of sediment, concededly derived from no other source than the creosote carried, and which sediment was unpumpable and could not be delivered as oil, in itself proves that all the cargo intrusted to the carrier was not delivered.

The method (which the evidence shows is the customary one for like purposes) employed in measuring and ascertaining the number of gallons of creosote, slurry, and water pumped into the ship's tanks, which constituted the cargo, is rather complicated, and the quantity of creosote actually shipped, as well as that pumped into the libelant's tanks at destination, depends upon the accuracy of the measurer. The measuring in question was performed by persons having considerable experience in that line of service. However, the exact amount of shortage will be made the subject for a reference, if the parties cannot come to an agreement in regard thereto, as well as the damages sustained by reason thereof, in case the respondent is held to be actionably liable for its failure to deliver all of the cargo put on board at Antwerp.

■ *Second. Was the cargo "free of pitch and freely pumpable* at a temperature not higher than 100° F."? The creosote was pumped without difficulty into the steamship's tanks from the shore tanks at Antwerp, and all the cargo, except the sediment referred to, was pumped without apparent trouble from the ship's tanks into libelant's shore tanks on the ship's arrival at port of destination.

Samples of this creosote were taken, the first on November 26th from the shore tanks before the loading, and the second on November 28th from each of the vessel's tanks after the completion of loading. They were taken by George Victor Williams, who testified that he was an assistant of Messrs. B. & R. Redwood, petroleum inspectors, in whose employment he then had been for six years; that he took three samples from each of the shore tanks, one from the top of the creosote just below the water and slurry line, another from about the middle, and the third from near the bottom; that the creosote thus obtained was put in a bucket, the contents stirred, and a sample taken therefrom; that

the sample from the ship's tanks was taken in exactly the same way; that these two samples were given by him to Felix H. Clerc, the representative of Victor Blagdon & Co., chemical merchants, who were the agents of the libelant.

Clerc testified that he gave a part of each ultimate sample to the chief officer of the Massasoit, and told "the captain and the chief engineer that it was essential that the creosote should during the voyage not be allowed to fall below a temperature of between 90° and 100° Fahrenheit," and that he kept the remainder of the samples for the use of the shipper.

Herbert E. Nickels, on behalf of libelant, testified that he was an analytical chemist in England, with 18 years' experience in testing and analyzing coal tar products, including creosote; that he analyzed a proportionate mixture of three samples of creosote oil, sealed "B. & R. Redwood," and labeled "Massasoit, Antwerp storage tanks 1, 2, and 3"; that these samples were delivered to him by Messrs. Blagdon & Co., who employed him to make the analyses; that his tests conformed to the American Railway Engineering Association specifications; that his first test did not include fluidity; that subsequently he made another test of these samples, and found the oil fluid after maintaining it at 100° F. for 48 hours, freely pumpable, and free from actual pitch as distinct from a small quantity of soft, pitchy residue usually associated with commercial creosote oil; that in making these analyses he used the standard retort, the distilling flask not then being used in England.

Libelant's expert, William E. Janes, to whom was sent a portion of these samples, testified that he was a chemist of 30 years' experience, and for the last 15 years had been engaged in the examination of coal tar materials; that he tested these samples for fluidity, and that he found the material free of pitch and freely pumpable at a temperature between 90° and 100° F., even as low as 85°; according to his laboratory report the samples so tested were received by him December 31, 1925, and were tested on January 29, 1926.

Respondent's expert, Allen W. Dow, to whom, on January 4, 1926, was sent a sample of the sediment taken from the ship's tanks after the cargo that was pumpable had been removed from the ship, testified that he was a consulting engineer, since 1906 with special experience in creosote oils; that he tested this sample, and found that it was practically free of pitch. Of course, the sediment tested by Dow, by itself, would not be freely

pumpable; but, in solution with the other constituents of the oil, the whole would be, and the test of the samples of creosote taken from the shore tanks shows that it was so pumpable. The evidence establishes that the cargo, so·far as its pumpability and freedom of pitch is concerned, complied with the charter's guaranty.

■ *As to libelant's claim that the creosote oil was not kept at the required temperature, and respondent's defense that its failure so to do was excused by causes falling under the head of "peril of the sea":* The Massasoit is a tanker of the usual type. It had 6 cargo tanks, each divided by a longitudinal bulkhead, making 12 in all, 6 on the port and 6 on the starboard side, designated as 1, 2, 3, 4, 5, and 6 port and starboard. Each was equipped with 16 heating coils, consisting of 2-inch pipe located about 7 inches from the bottom. There was none on the sides of the tanks. These coils were connected with the boilers, 3 in number, which assumedly were of sufficient capacity to heat all the tanks to the temperature required by the charter and to propel the vessel.

She had previously carried creosote oil, but in quantities not exceeding 2,800 tons on voyages from 3 to 5 days, and never across the Atlantic Ocean. The cargo carried just previously to the one here considered did not require heating of the tanks, and they had not been heated for more than six months before the present cargo was loaded.

First, as to the temperature of the oil: It is undisputed that the oil was not kept at 90° to 100° F. continuously during the voyage. At the outset, we are confronted with the question: When did the voyage begin? Unless the meaning of this term is affected by the immediate context, it is probable that, under the authorities, a voyage begins only when the ship, after being loaded, is ready to sail—break ground. Wood v. Hubbard (C. C. A. 3), 62 F. 753; The Buckingham (D. C. E. D. Pa.) 129 F. 975; Ralli v. New York & T. S. S. Co. (C. C. A. 2) 154 F. 287; Steamship Wellesley Co. v. C. A. Hooper Co. (C. C A. 9) 185 F. 733; Gilchrist Transport Co. v. Boston Ins. Co. (C. C. A. 6) 223 F. 716; The New Port (D. C. N. D. Cal. S. D.) 3 F.(2d) 1017; Crow v. Falk, 8 Q. B. (Ad. & El.) 467; The Rona, 5 Asp. M. C. 259.

In Wood v. Hubbard and The Buckingham, supra, there are dicta that the voyage begins at an earlier period—in the former (page 753 of 62 F.), when the vessel is chartered for an immediate voyage; and in the latter (page 976 of 129 F.), when she sets about doing what is to earn freight for the owner. The company kept by the term "voyage" (context) suggests that the heating obligation is not confined to a time subsequent to breaking ground—moving away. Respondent's duty was not merely to begin heating after the steamer left the docks at which she was loaded, but to keep the oil "heated at 90° to 100° F. * * * and in a fit state for ready discharge on arrival at destination." This concluding clause is not meaningless.

■ If the heating of the cold tanks, preparatory to the reception of the warm oil, was necessary in order that it might be in a fit state for discharge, it would seem that it was a part of the carrier's duty to so warm the tanks, else the steamer would not be cargo worthy. If to keep the oil in that fit state, the tanks not having been heated at the beginning of the loading, it was necessary to put steam into the heating coils during the loading, the obligation to so heat the tanks also seemingly rested on the respondent. Merely to supply tanks equipped with heating coils, without putting steam into the coils, would not be a compliance with the charter obligation. The shipper, under this charter, had a right to expect that the carrier would properly care for the oil from the time it obtained possession of it. The carrier, and not the shipper, controlled the heating apparatus and the method of heating it. To make the tanks cargo worthy, it was the duty of the carrier to take proper and reasonable precautions to preserve the oil as it was pumped into the tanks at the temperature it was delivered, or at least to the minimum degree required by the charter. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Kaufer Co. v. Luckenbach S. S. Co. (D. C. W. D. Wash. N. D.) 294 F. 978; The Jason (D. C. Md.) 28 F. 323. This precaution the carrier did not take.

The temperature of the creosote in the shore tanks, just prior to loading it into the ship's tanks, was 105° in tank 1, 102° in tank 2, and 87° in tank 3—an average of 98°. No heat was turned into any of the steamer's tanks during the 36 hours of the loading. After the cargo was all pumped into the tanks, the average temperature of the oil had dropped to 80°, or a little over. At 9:45 a. m., November 28th, the steamship left the Antwerp docks; arrived off Dover, England, in the third watch, about 10 a. m., the next day; and reached the port of New York on December 18th.

The following schedule or tabulation is deemed helpful in determining the merits of the contentions of the parties in the matter here treated:

Schedule Based on the Steamship Massasoit's Logs and Oral Testimony of its Officers.

| Date | Watch | Steam on in Tanks | Steam off of Tanks | Temperature Taken in Tanks | Temperature after Steam Had Been on | Wind Force (Beaufort Scale)* | Wind Direction | Weather | Sea | Effect on Vessel | Effect on Engine | Speed | Daily Miles Run to Noon of |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1925 Nov. 28 | 4 | None | 2,4,6 after 5 hours | | | 2-3 | NW | Rough | Rough | Taking water | | Full | |
| 29 | 8 | 1,2,3,4,5,6 | None | None | 93° after 5 hrs. 47 after 5 hr. 5 | 3-10 | NNW | Bad; snow squalls Rough and heavy | High | Water on deck; Roll. 20-30 deg. | Working Irreg. | Full | 100 |
| 30 | 8 | 2,4,6 | None | None | 94° after 5 hr. Nov. 29, 24 hr. | 6-9 | WNW | stormy | Rough and Rough | | | | 191 |
| Dec. 1 | 8 | 1,3,5 | 2 and 4 | 5 | Dec. 1 92° 48 hr. 94° 33 " | 3-4 (Off) | N | Rough and Rough | Moderate | Rolling moderately | | | |
| 2 | 8 | 2 and 4 | 2 and 4 | 5 | 93° 24 hr. | 2-3 | ENE | Moderate | Quiet | Rolling moderately | | | 206 |
| 3 | 4 | 5 and 6 | 5 and 6 | 8 | 94° 24 hr. | 8-10 7-10 (Off) | ESE | | High | Steam pipe broke; Taking water; sea oil used | Various | | 220 |
| 4 | 3 | None | 6 | 8 | | 6-9 | ESE | | " | Water on deck; pipe broken; sea oil used | " | | 205 |
| 5 | 3 | 1 and 3 | 5 | 8 | 5th watch: 94° on 44 hrs.; off 96 hr. | 4-8 | ESE | | " | Labor, hard; water on deck; sea oil used | " | | 192 |
| 6 | 3 | 2 and 4 | 6 | 8 1 | 93° 93° 86° 92° 24 " 27 hr. 24 hr. | 8-6 | NNW | | Moderating High | Rolling strong; water on deck | " | | 198 |
| 7 | 3 | Probably kept on part of time | Probably kept on in 2 and 4 | 3rd watch—4 " —2 4th watch—2 | 94° after 27 and 24 hrs. | 5-6 6-4 (Off) | N, NW | | High | Pipe broken; water Racing | Various | | 194 |
| 8 | 2 | 5 and 6 | 2 and 4 | 4th watch 2 & 4, and 2 & 4 | 96° 27 hr. more | 3-5 (Off) 3-10 | W, SE | | Rough | Pounding hard; pipe broken; pipe | | 4th watch Half, 5th " , 6th " Full | 200 |
| 9 | 3 | 1,2,3 | 5 and 6 | 5 and 6 | 92° 24 hr. | 8-2 | SW,NW,SE | Rain squalls | Heavy | water on deck; pipe broken | | | 170 |
| 10 | 3 | 4,5,6 | 1,2,3 | 1,2,3 | 92° 24 hr. | S-NW | S-NW | Heavy | Heavy | Laboring moderately | Working Irreg. | | 202 |
| 11 | 3 | 1,2,3 | 4,5,6 | 4,5,6 | 91° 24 hr. | 5-6 | NW | Heavy | Moderate rough; Heavy | Pound. severely; wa-ter on deck; sea oil used | Working Irreg. and racing | | 189 |
| 12 | 2 | 1, 2, 3 | 1,2,3 | 1,2,3 | 80° 21 hr. | 2-12 | W, SW | Hurricane | Rough | Rolling hard; water on deck | | | 150 |
| 13 | 3 | 4,5,6 | 1,2,3 | 1,2,3 | 93° 27 more | 8 | W,NW,W | Heavy rain | High | Pound. hard | " | | 113 |
| 14 | 3 | 1,2,3 | 4,5,6 | 4 and 5 6 | 8 | 8-11 | NW, W | "Intermittent hurri-cane and snow squalls" | Very high Moderating | " | " | 5th watch reduced | 129 |
| 15 | 3 | 1,2,3 | 1,2,3 | 1,2,3 | 90° 94°} 24 hr. | 6-11 (Off) | NW | Snow squalls | Moderating | Laboring hard | Racing & pound. | Slow | 75 |
| 16 | 3 | 2,4,6 | 1,2,3 | 2,4,6 | 92° 24 hr. | 4-5 (Off) | NW | Moderating | Moderating | | Working Irreg. | Various | 159 |
| 17 | 2 | 1,3,5 | 2,4,6 | 2,4,6 | 90° 21 hr. | 5-7 (Off) | NW | Moderating | Moderating | | | | 198 |
| 18 | 1 | 1,2,3,4,5,6 | 1,2,3,4,5,6 | 1,2,3,4,5,6 | | 4-7 (Off) | NW | | | | | | 74 / 3335 |

*In this column the word "Off" means as testified by Chief Officer Off; other figures from logs.

The data tabulated in this schedule, taken mainly from the vessel's logs, supplemented by other testimony, show that until the fourth watch of November 29th, no steam had been turned on in any of the ship's tanks; that at that time steam was put into all the tanks, and after about five hours was turned off in tanks 2, 4, and 6, and from that time until the vessel arrived at destination the steam was not on in all the tanks at any one time; that on November 30th, in the third watch, the steam was turned off in tank 5; that from that date to December 9th steam, when kept on, was in only two tanks at a time, and from the latter date, until the day of arrival at the port of New York, in only three tanks at one time; that no steam was on in any tank from the fourth watch December 3d to the third watch December 5th.

As noted, the temperature of the oil in the tanks, taken by the libelant's representative on November 28th, just prior to the steamer's "breaking ground," was a little over 80°. Thereafter the temperature could be taken only by the carrier. No temperature was taken on November 29th or 30th, nor on December 4th or 16th. At no time was the temperature taken in any tank until after the steam had been on it for at least 21 hours, and in most instances after 24 or more hours.

The method employed in taking the temperature gives no assurance that the degrees reported represent the general temperature of the tanks tested. It was not taken at different depths. The average depth of the tanks is 34 feet. The thermometer used, attached to a line, was lowered to and held in place between 20 and 25 feet from the tops of the tanks. The coils were at the bottoms of the tanks. Heat moves upward more rapidly than downward, and admittedly the oil tested was hotter near the top than at the bottom of the tanks. Therefore the taking of temperature at a level about one-third distant from the bottom furnishes no indication of what the temperature of the mass of oil was in the lower depths, and particularly close to the bottom and on the sides of the tanks, where the sediment would lodge.

The duty to keep the oil heated at the given temperature applied to all of it, and the method used was not calculated to ascertain the temperature of the whole mass of oil. The sameness of the temperatures reported in the greater number of instances is singular, and the absence of oral testimony that each tank so enumerated had

the same temperature, taken in conjunction with the results of the tests of the oil in the shore tanks at Antwerp and in the steamer's tanks when the cargo was being discharged, which varied considerably, engenders a doubt as to the accuracy of the reported temperatures.

Furthermore, temperature taken only after steam had been on for many hours affords no indication of how hot or cold the oil was during the time the heat was kept off. The shell of the steamer was in constant contact with the winter-cold sea water. This, and the frequent washing of its decks by the cold water, due largely to the endeavor to keep the vessel on its course and thus speed the voyage, was bound to cool the oil nearest its shell and decks, and in time lower the temperature of the entire mass. Obviously such conditions, endeavors, and effects called for a more frequent and thorough testing of the oil's temperature than was given, in order that its exact degree of heat might be known and be prevented from falling below the minimum specified, by applying thereto the necessary heat. The log book entries, in several instances, afford strong evidence that the lowering of the temperature must have been considerable during the periods when the oil was left unheated: December 5th, in tank 3, after steam had been on about 44 hours, the temperature was only 84°. December 7th, in tank 2, after steam had been on 27 hours, the temperature was but 86°. December 12th, in tanks 1, 2, and 3, after steam had been on for about 21 hours, the temperature was but 80°.

As the respondent was in exclusive charge and control of the cargo from the time the loading was completed, no one but it could tell how low the temperature became in any of the tanks, and it has not given this information. The inferences, however, are strongly to the effect that there must have been many periods when the temperature of the oil in all the tanks was below the minimum prescribed, and in some tanks much below the 80°.

That crystallization of the heavier salts of creosote oil takes place when the temperature falls below 80° is established by the evidence on another branch of this case, presently to be considered, and that separation of such salts from the lighter material in the oil follows closely upon crystallization, with eventual precipitation and depositing of sediment, is the necessary inference of that evidence. The failure to heat the tanks preparatory to loading, or

at least during the loading, was responsible for the dropping of the temperature from an average of 98° to a little over 80°. This should have admonished both the captain and the chief engineer, who were advised by Clerc that it was essential that the oil should be kept heated between 90° and 100° F., to immediately put steam into the tank coils. However, as noted, this was not done, nor was any steam put on during the following 24 hours.

The formation, not to say precipitation, of crystals, probably, was well on the way by the time Dover was reached. The temperature having dropped to near 80° at the conclusion of the loading, the inference is justified that it continued to drop during the following 24 hours, while the vessel was on its way through the cold sea water to Dover, and that a separation of the heavier salts from the lighter material composing the oil was already in progress. How far the separation and possible precipitation had advanced to this time is, of course, problematical. That the oil at the bottoms and sides of the tanks then had become "seeded" must be accepted as proven. The subsequent failure to put heat into all the tanks, and to keep it there, but accelerated the crystallization and eventual separation and precipitation which actually took place. The failure to heat, and keep heated, the oil in the tanks at the required temperature, in the absence of evidence to the contrary, sufficiently accounts for the sediment found in the steamer's tanks after arriving at the port of discharge.

█ *Second. Is this failure to maintain the oil's temperature to at least 90° F. due to "perils of the sea," and, therefore, excusable under the express terms of the charter?* The respondent so contends.

The Massasoit had a rough passage. Rain, snow, and gales were encountered. The sea frequently washed the decks, on several occasions breaking a pipe on deck, requiring the ship twice to be hove to, to make the necessary repairs, and once breaking in the door of the port corridor amidships, causing the officers' quarters to be flooded. Sea oil twice was used to minimize the violence of the waves, and at one time life lines were placed about. The pounding of the ship was frequent, and at times she labored hard. The engine frequently worked irregularly and raced. Shortly after leaving Antwerp, and while in the River Scheldt, the ship twice had to be anchored for short periods, and the pilot taken on at Flushing could not depart at the accustomed place,

and had to be carried to Dover. On the way to Dover the weather was so bad that, in the opinion of the master, the safety of the vessel required that all the available steam be used for navigation. The assigned reason for taking of the steam from tanks 2, 4, and 6 on November 29th was that enough water could not be kept on the boilers; that for taking it from tank 5 on November 30th, "because the loss of steam and water in the engine room was too great"; and that for taking it from tanks 5 and 6 on December 3d, and keeping it off all the tanks for nearly two days, because steam was needed to assist in steering the ship.

The testimony of the master, chief officer, and chief engineer, in effect, is that heavy weather was experienced all the way, and there were only two days when the waves were not washing over the decks. The chief officer said that the weather encountered was just about what was expected in November and December, while the master said that generally weather is not very bad in December, but that the weather on this trip was worse than he had experienced for several years preceding, and that when "we had the hurricane squalls it looked very often bad"; that in good weather the trip could be made in 13 days, while this trip took 19 days, caused by the bad weather and the racing of the engine.

According to the log book, supplemented by the ship's officers' testimony, there were two periods of this 19-day voyage when the weather and sea conditions, in the judgment of the officers, required all the steam for navigation. The first period covered the first 3 days of the voyage, November 28th, 29th, and 30th. The wind force on these days was, respectively, 2 to 3, 3 to 10, and 5 to 8.

On the first of these days, after resuming a twice interrupted voyage in the River Scheldt, and after passing Flushing, heavy hail and snow squalls were encountered; on the second, while still on the way to Dover, at times the roll of the ship was 20 to 30 degrees, with the sea washing over the decks continuously; and, on the third, the sea continued rough and heavy till Dover was reached. The second period was during a part of December 3d and all of December 4th, when the wind force was 6 to 10, and during which the door (heretofore referred to) was broken in by the force of the wind and waves.

Do the conditions here referred to amount to the "perils of the sea," contem-

plated in the immunity provisions of the charter?

"The phrase 'perils of the sea' whether understood in the most limited sense, as imparting a loss by natural accidents peculiar to that element, or whether understood in its more extended sense, as including inevitable accidents occurring upon that element, must still, in either case, be understood to include such losses only to the goods on board as are of an extraordinary nature, or arise from some irresistible force, or from inevitable accident or from some overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence." Story on Bailments, § 512. The Giulia (C. C. A. 2) 218 F. 744. It "means something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety." The Rosalia (C. C. A. 2) 264 F. 285; The Skipsea (C. C. A. 2) 9 F.(2d) 887; The City of Dunkirk (D. C. S. D. N. Y.) 10 F.(2d) 609; The Edith (C. C. A. 2) 10 F.(2d) 684; The Arakan (D. C. S. D. Cal. N. D.) 11 F.(2d) 791.

The wind and wave conditions encountered, while severe, were only such as might be expected and looked for at that time of the year, and, tested by the law just stated, do not amount to "perils of the sea," as contemplated by the charter, and do not excuse the failure to properly heat the creosote oil in question. Furthermore, the probable effects on the cargo, if such conditions should be encountered immediately or soon after leaving Antwerp, should have been provided against, by keeping the cargo heated at least to the minimum degree of temperature stated in the charter, while the opportunity so to do was afforded. Had this been done while the cargo was being loaded, the drop of temperature from 98° to 80° by the time the loading was completed, and the further dropping which undoubtedly took place while the ship was making its way down the Scheldt to the open sea, would have been prevented; and, had such heating been renewed in the intervals permitted during the first period, while the vessel twice was anchored in the Scheldt, and between it and the second period, when the wind force was but 2 to 5, the temperature, which might have fallen in these periods of no steaming, would have been raised and brought again to the minimum requirements.

Again, it is quite evident, by the subsequent alternating of steam in three tanks at a time during the latter and worst part of the voyage, that the wind and wave conditions encountered during the two periods mentioned were not of such an extraordinary nature as to baffle skillful and vigilant seamen, accustomed to cope with the serious conditions frequently presented by wind and wave during a winter voyage on the north Atlantic Ocean. After December 4th, the wind force reached a velocity of 2 to 12, 8 to 11, 6 to 11, on December 12th, 14th, and 15th, respectively, much higher than during any other part of the voyage, and the average sea conditions during the latter part of the voyage were worse than those encountered during the periods when it was thought necessary to use all the steam for navigation purposes. Yet, during all the time that the wind and sea conditions were worst, the steam was kept on in three tanks at a time, while before that, even when steam was kept on, no more than two tanks were kept in steam at the same time. If, during the worst part of the voyage, steam could be put into more tanks at a time than when the wind and sea were more favorable, whatever may be the reason for the failure to apply steam in the forepart of the voyage, it could not have been because of the absolute necessity to use all the steam that the boilers could produce for navigation purposes only.

Anticipating the possibility of such a finding, respondent contends that in such an event the failure to keep the tanks heated to the required degree of temperature was due to error, neglect, or fault in the navigation or management of the vessel, and that by the express terms of the charter respondent is not responsible for loss or damages arising or resulting therefrom. The weakness of this contention is that the error, neglect, or fault referred to does not relate to navigation or management of the vessel, but to the duty of caring for the cargo. That the steam for heating the tanks and for the propelling the ship came from the same source is unimportant.

Respondent had the exclusive custody and control of the cargo from the time the loading was concluded. It alone could carry out the requirements of the charter, which in terms obligated it to have "the necessary steam-heating apparatus" to keep the creosote "heated at 90° to 100° F. continuously" and "in a fit state for ready discharge on arrival at destination." If it saw fit to draw steam for propelling the vessel and for heating the cargo from the same source, that was its privilege.

Having done so, it could not absolve itself from its duty to heat because, in order to speed the voyage, it needed steam for that purpose. If, at times, because of the untoward wind and sea conditions, it found it impossible to maintain both the desired and contemplated speed of the ship and the prescribed heat in caring for the cargo, its primary duty was to preserve the creosote even at the expense of speed.

That this duty was not performed is evidenced by a comparison of the number of sea miles run on the days when the steam was either not kept on in any of the tanks, or only in a few of them some part of the time. The schedule of miles run shows that the average number of miles per day was considerably greater in the earlier part of the voyage; that is, up to December 9th, during which the lesser number of tanks were kept in steam. This average is 195 in the earlier, and 144 in the latter, part of the voyage.

This schedule also shows that, on those days when the steam was taken off the tanks, in whole or in part, because of assigned necessity, the run of the vessel was far in excess of the average run during the latter part of the voyage; i. e. from December 9th. The run from noon November 29th to noon November 30th was 191 miles. During this period steam was taken off three of the tanks, for the assigned reason that enough water could not be kept on the boilers. From noon November 30th to noon December 1st, the distance covered was 170 miles, during which period four tanks were kept without steam, for the given reason that the loss of steam and water was too great. From noon December 3d to noon December 5th, during which two days practically no steam was on in any of the tanks, for the asserted cause that the weather was so bad that the steam was needed to assist in steering the vessel, the average run per day was 198½ miles.

The distance covered during the days when the steam was taken from the tanks for the alleged reason that the weather and sea conditions demanded it, being much more than the 144 miles per day, the average mileage during the latter part of the voyage, when alternately three tanks at a time were constantly supplied with steam, indicates that the respondent, during the forepart of the voyage, subordinated its primary duty, care of the cargo, to its secondary duty, securing speed. The record negatives the alleged reason that the failure to keep the temperature of the oil at the required degree was due to extraordinary weather and sea conditions.

■ *Third. As to respondent's claim that the failure to deliver all the cargo was due to the inherent vice of the creosote oil:* As noted, clause 21 of the charter provides that "the steamer shall not be accountable for any consequences arising from charters shipping different kinds * * * of creosote oil," and section 2, article 4, of the (English) Carriage of Goods by Sea Act, 1924, exempts responsibility for loss or damages due to "(m) wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods."

Respondent contends that this creosote oil was not the usual kind, but abnormal, because of its large anthracene content, and that, if it had been continuously heated to a temperature between 90° and 100°, the separation and deposit of this salt would have taken place anyway. Creosote is a coal tar product, and contains in solution napthalene, anthracene, and other salts which precipitate if the oil becomes cold. It also contains water in suspension, and has no standard chemical formula. The amount of solids, such as anthracene, which the oil can dissolve or keep in solution, depends upon the temperature of the oil; the higher the temperature, the greater the amount of solids which can be kept in solution. Ordinary creosote tends to deposit salts if its temperature falls below 90° Fahrenheit, because its solvent properties then are released, and cannot overcome the tendency of the solids to revert to their natural form, with the result that the oil becomes overloaded and precipitates parts of its solids. As a commercial product it is usually sold under the specifications of the American Railway Engineering Association, or the American Wood Preservers' Association, which contain no provision as to what percentage of anthracene or napthalene is allowable.

Concededly, a continued dropping in the temperature in the course of time results in crystallization of the salts, with ultimate complete separation. As the respondent was required to heat the creosote, and to keep it "heated at 90° to 100° F. continuously during the voyage, and in a fit state for ready discharge on arrival at destination," and as the proofs show that it was not so kept, and that the failure in this respect was not due to perils of the sea, an examination of the evidence given by the experts is in order to ascertain, if possible,

whether, as contended by the respondent, the sedimentation found would have taken place anyway, even though the required temperature had been maintained.

Chemist Allen W. Dow, in substance, testified that the sample of the sediment found in the ship after the pumpable cargo had been removed therefrom was tested by him in a retort, to see whether it complied with the American Wood Preservers' Association specifications; that he found a large percentage of the distillate was anthracene, which he calculated as 25.2 per cent. on the whole sediment; that this was unusual; that specific gravity has little effect on the tendency of creosote to deposit crystals or solids; that he believed that, even if the temperature of the oil in the ship's tanks had been kept between 90° and 100°, there would have been a deposit of anthracene crystals at the end of the voyage; that ordinary creosote oils begin to settle out crystals when the temperature falls below 90°; that the most common tests of ordinary creosote were those of the American Railway Engineering Association and the American Wood Preservers' Association, which make no requirement as to anthracene or napthalene; that, if the cooling of creosote is slow, the crystals will be large, and that, the larger they are, the slower they will melt; that he had no sample of the creosote that came from Antwerp; that the oil on Nickels' analysis was not grade 1 creosote oil, according to American Railway Engineering specification.

Chemist Herbert E. Nickels, in substance, testified that he did not think there was any standard percentage with reference to the amount of anthracene in usual and customary commercial creosote; that he did not know what percentage of anthracene was in the oil analyzed by him, as he made no test for that salt, not being required to do so under the American Railway Engineering Association specifications; that he could see there was some napthalene in the oil, but he thought about 5 per cent. only, and that he did not think there was any relation between anthracene and napthalene content of normal, customary commercial creosote oil; that he did not consider a 25 per cent. content of anthracene in the sediment on the sides and bottoms of the tanks indicative that the creosote prior to the deposit contained an abnormal percentage of anthracene; that he saw no reason why the oil, with such a content, should not be freely pumpable at a temperature of 100° F., provided the rela-

tion of the 25 per cent. of anthracene to the oil was not excessive, and had not in the first place been allowed to solidify.

Chemist William E. Janes, in substance, testified that by the use of the new distilling flask he analyzed two samples—each about two-thirds of a quart of creosote—from the Antwerp shore tanks and the Massasoit's tanks, which he received December 31, 1925, in containers marked "Redwood & Company of London"; that he made the American Railway Engineering Association test, and obtained a small deposit of crystals or sediment at 80°, which entirely disappeared when the temperature was raised to 100° after about 48 hours; that creosote in a tank, the sides and bottom of which are allowed to cool to 80° F., would precipitate salts and sediment, first appearing on the cool surface; that he concluded, from the fractional distillations made and from the oil's appearance, that it was normal as to anthracene and napthalene salts; that it was a No. 1 creosote, fluid at 87°, and would not form sediment at 90° F.; that no definite relationship exists between napthalene and anthracene content of normal creosote oil; that the laboratory tests made in incubators in no sense duplicate conditions aboard ship; that the specific gravity of oil has little to do with its tendency to form bottom sediment, but that, the more solids in creosote, the greater would be the tendency to crystallization.

John Morris Weiss, a witness for respondent, in substance, testified that he was a research chemist since 1905 and a consulting chemist and chemical engineer since 1922, and had large experience with coal tar products, particularly with creosote oil; that he examined Nickels' report, and found that the analysis made by Nickels did not conform to the American Railway Engineering Association specifications; that the float test indicated that the oil was heavier than would meet these specifications; that there was "more possible solid crystalline or gummy residue"; that Janes' laboratory report was in accordance with these specifications, and differs from the test made by Nickels on what purports to be the same sample of oil; that the Janes test is of a much lighter boiling oil than that of the Nickels test; that it seems unlikely that these oils came from the same tanks; that a reasonable conclusion is that there must have been put into the ship's tanks a heavier oil between the taking of the samples; that shortly after the outbreak of the World

War he endeavored to find an American coal tar, of a crude material, to start with 25 per cent. to 30 per cent. anthracene, and could not find more than 15 per cent. in the ordinary commercial creosote oils examined; that an oil which would deposit a solid slightly over 25 per cent. anthracene would not be usual; that creosote can take comparatively a larger amount of napthalene than anthracene in solution, the former being five to ten times more soluble than the latter in coal tar oils; that an oil, the sediment of which contains 25 per cent. anthracene, is not all pumpable at 100° that, if there are more crystals than the oil has solvent power for, the crystals will not go into solution, no matter how long it is kept at a given temperature; that the shell of the tanks in contact with sea water cannot be made as warm as the interior, and that very minute crystals will form on the inside of a tank; that these crystals seed the mass, the seedage continuing to the equilibrium point, when separation of solids takes place; that this separation will take place if the temperature is between 90° and 100°, and, the greater the anthracene content, the more is the oil susceptible to this process; that with the temperature of sea water ranging from 43° to 59° F., and heavy seas breaking over the sides and decks of ships, it is reasonably certain that the oil from which the deposit separated, showing at the end of the voyage a 25 per cent. anthracene content, would not be fluid and freely pumpable at a temperature not exceeding 100° F.; that it is possible for creosote oil at any temperature to contain crystals in solution, which will crystallize at the temperature of 100°, but which has not yet crystallized; that time is a considerable factor; that it is possible to load material freely pumpable, perfectly fluid, at 100° F., hold it at 100°, and at the end of a week find a bit of crystal separated out, which would go back into solution only at a much higher temperature; that this may account in some measure for the sediment deposited in the Massasoit.

Sumner R. Church, a rebuttal witness for the libelant, in substance, testified that he was a consulting chemist, specializing in coal tar products, including creosote oils, with an experience of over 20 years; that the question of the solution of the crystal in oil had no direct relation to the crystal's melting point; that it is not possible, by measuring percentage of anthracene in a residue sample of salts deposited from creosote oils, to determine whether there was an unusual amount of anthracene in the original oil; that an analysis of such a sample, unaccompanied by an analysis of the oil from which such salts were deposited, affords no sufficient basis for an opinion as to whether the oil was originally freely pumpable at a temperature of 100°; that a residue thus obtained might be from an oil having a very low anthracene content; that the float test has nothing to do with the free pumpability of the oil; that the difference between Janes' laboratory report and Nickels' analysis does not affect the question of free pumpability of the oil at 100° F.; that the float test is a very delicate one, susceptible to variation between different operators, and that there is no reason for surprise that there was an apparently wide difference in these two tests; that the application of steam and salt water to the residue in the ship would probably wash therefrom some of the liquid oil and possibly some of the solids having a lower melting point than anthracene, and tend to compact or harden the latter salt, and make it more difficult to melt; that the rate of heat transfer is much more rapid from metal to water than from metal to air, and that creosote would lose its heat more rapidly than water by about three to one; that it requires a higher temperature to melt salts in a liquid than to keep them in solution originally, and particularly a deposit that is below the coils, and not above or around them, as heat rises upward more rapidly than downward; that the higher the gravity, the more anthracene may be expected; that anthracene deposits with other compounds, and the actual anthracene content of the residue simply means the percentage of pure anthracene in the material tested; that, in determining the degree of temperature at which a deposit will melt, time is an important factor, and that, in speaking about the time required, much depends upon whether one is using a test tube, or a storage tank, or a steamer tank; that in the case of the tube the heat is coming from the outside rapidly, penetrating through all parts of the oil, and in the case of the tanks it comes through coils on the inside, taking a longer time to heat throughout; that the American Railway Engineering Association specification tests have no bearing on fluidity; that the residue found in the Massasoit's tanks did not look like the residue from usual, customary, normal creosote, as it was very dry, while the ordinary sediment is almost always moist and oily; and that washing the residue with

water and subsequent steaming it would tend to dry the salts.

Thomas J. De Mund, in substance, testified that he was a creosote oil chemist, agent of libelant for 18 years, and superintendent of the discharging and shipping of oil at the port of Chalmette near New Orleans; that he analyzed the oils discharged at such port and in libelant's plants located there; that most of the creosote handled by libelant comes from Antwerp, and that such oils are generally uniform; that the oils received from there between September, 1925, and March 1, 1926, were uniform and free from solids and sediment; that it was unusual to find sediment, and that, during his 18 years' experience, only two vessels carrying such oils had been found to have sediment; that he aimed to keep the temperature at the tanks from 90° to 100° F.; and that, if the temperature dropped below 85°, sediment was found, but not if it was above that temperature.

The analyses of Nickels and Janes, shown in their written reports, were of samples taken from the Antwerp shore tanks. Janes deposed that he made an analysis of the samples of oil taken from the ship's tanks as well, but no written report thereof appears in the record. Samples of the oil taken from the ship, turned over to libelant, were not delivered to respondent, though the latter requested it. This failure to deliver, and the nonproduction of a written analysis of the sample, were made the basis for an unsuccessful motion to suppress the analysis made by Janes as evidence. Respondent also contends that, as there was a difference in the results obtained by Nickels and Janes in the oils tested by them, they could not have been the same oils. Furthermore, it is contended that the differences between their tests and that made by Dow from the sediment obtained from the ship's tanks after the pumpable oil was taken thereout strongly suggests that a heavier oil was put into the ship's tanks between the times that the samples were taken at Antwerp; i. e., between the time the samples were taken from the shore tanks and the time the samples were taken from the ship's tanks.

There is no intimation that the oil in the ship's tanks was obtained from any source other than the Antwerp shore tanks, and the only fact in evidence, relied upon in support of these contentions, other than the difference in the tests referred to, is that slurry was put in the ship's tanks after the samples were taken from the shore tanks. But this slurry, undisputably obtained from these or one of these shore tanks, could not have contained a heavier substance than was in the oils pumped into the ship's tanks.

Slurry, as the evidence shows, is a mixture of oil and water, produced in the Antwerp tanks, and the cars delivering oil to them, through the introduction of steam in heating the oils contained therein, neither tanks nor cars being equipped with pipes for heating. Slurry thus made cannot contain heavier salts than found in the oil from which it is produced. Indeed, slurry thus made is lighter than the oil itself, and floats in a layer between the good oil and the free water on top of the oil.

While the failure of the libelant to give respondent the requested samples of oil taken from the ship's tanks, plus its failure to introduce in evidence the analysis of that oil, is regrettable, there is nothing in the evidence that would justify the rejection of the tests made by Nickels and Janes from samples of oil taken from the shore tanks, or that would justify an inference that a heavier oil—one containing more anthracene—was put in the ship's tanks than was contained in the samples of oil taken from the shore tanks, which was made the basis of Nickels' and Janes' written reports.

In the several tests referred to by the experts, only the libelant's experts used oils obtained from the Antwerp tanks. Therefore only libelant's tests could give the true relation of the salts and other ingredients making up the body of the oil. Respondent's expert Dow had only a sample taken from the sediment found in the ship. This sample, by reason of the treatment given the solids found in the tanks after the pumpable fluid had been removed—i. e., first washing with cold salt water, and then turning hot steam on it—could not afford the basis for a convincing test to ascertain the percentage of anthracene content in the solids as they existed before such treatment, for, by the washing and steaming, the oils and lighter salts accompanying the heavier salts, such as anthracene and napthalene, during the precipitation, were removed from the sediment as originally precipitated, and only the heavier salts remained for testing. From a residue thus produced, one cannot even ascertain with reasonable certainty the percentage of anthracene in relation to the other ingredients of the sediment as originally deposited

much less in relation to the mass of oil before the precipitation began.

To bring a thus segregated sediment into a condition comparable with the samples tested by the libelant's experts, it would have to be brought into solution with oils having all the constituents possessed by the cargo as pumped into the ship's tanks. This, assuming that it could be done, was not done. What respondent's expert Dow did was to place 2 grams of sediment in 38 grams of oil, or about 5.3 per cent. of the total creosote tested. What the percentage of the constituents of this oil was with reference to anthracene does not appear, but it is inferable that, unlike the oil in the ship's tanks, from which the sample sediment had been precipitated, it contained at least the normal percentage of anthracene, thus making the sample tested abnormal in anthracene content.

The results of tests thus made cannot be accepted as displacing the tests made by the libelant's experts. They, as noted, were made from samples of the oil obtained from the Antwerp tanks, and they must be given more weight as to the probable percentage of anthracene contained in the mass than the tests made by respondent's experts from a mixture not proven to be the same, and which, in all probability, contained a much larger percentage of the heavier salts. The libelant's tests show that the anthracene content was not abnormal for commercial creosote, and that this salt would stay in solution if kept at 90° F. Tests of that kind are not to be lightly set aside. They are more satisfying than those made with samples not shown to possess the same constituents, even though accompanied by the opinions of experts, no matter how well qualified, based upon hypothetical questions not containing the precise elements found in the samples tested by libelant's experts.

In dealing with the defense of inherent vice, the percentage of sediment to the quantity of cargo put aboard must not be overlooked. The cargo consisted of 6,019 tons. The refuse was about 135 tons, or 2.2 per cent. of the cargo. This was not all anthracene, nor, in all probability, did it contain all the anthracene carried in the cargo. This percentage is not so large, in view of the failure to keep the mass of oil constantly heated at a temperature not less than 90°, as to justify the inference that the oil carried an undue amount of this heavy salt. The contrary opinion seems to me to be the more justifiable, viz. that, if the temperature had been kept up to the minimum requirement, by far the greater part of the sediment would have been kept in solution, and that such part of it which might have precipitated would have been negligible, in view of the evidence that other vessels carrying creosote at this time—before and after—had brought in their cargoes with but little, if any, deposit. The record negatives this defense of inherent vice.

■ *As to the plea of General Average:* Under this head respondent contends that, "if the failure to keep up the temperature on November 28th, 29th, and 30th and December 4th contributed to the loss, such loss is a general average loss." As noted, on November 28th no steam was in any of the tanks; on November 29th, it was in all for a part of the time; on November 30th, it was on in tanks 1, 3, and 5; and on December 4th, no steam was in any, for the summarized reason that the steam was needed for navigation. There is no claim that any of the oil was jettisoned, or used to quiet the violence of the waves, or for any other purposes. Sea oil was used to calm the sea on the 3d, 4th, and 5th of December, but respondent expressly disclaims that any of libelant's oil was used for that or any other purpose.

■ The reasons given for the failure to put on steam during the passage from Antwerp to Dover and the taking of it off the tanks on December 3d and keeping it off until December 5th, have already been analyzed and considered on another branch of the case. They were there deemed insufficient to constitute peril of the sea, and the evidence in relation thereto tends to the inference that the purpose to make distance on those days, and not the safety of the vessel or cargo, was the impelling motive for diverting the steam from the tanks to the engine. On none of these days was there imminent or impending physical peril, common to vessel and cargo, and no voluntary sacrifice of anything on board ship was made to avert any supposed peril, two of the essentials to constitute general average. Ralli v. Troop, 157 U. S. 386, 15 S. Ct. 657, 39 L. Ed. 742; The Mary F. Barrett (C. C. A. 3), 279 F. 329, 25 A. L. R. 148. Congdon on General Average, p. 10.

The loss of or damage to the cargo was not occasioned by an express appropriation of any part of the cargo, or deterioration thereof due to delays in transportation, but to crystallization and separation of the heavier salts from the other constituents of the creosote, attributable to the respond-

ent's breach of contract to keep the oil heated to the specified temperature, and the doctrine of general average is not applicable to such conditions.

■ *As to respondent's contention that the libelant is disentitled to any recovery for failing to minimize the damages:* This contention is founded on libelant's refusal to accept the tendered delivery of the sediment placed on the Massasoit's decks. The respondent was under charter obligation to deliver the cargo as oil, to "be pumped out of the steamer at the expense of the steamer." The sediment in question was not oil, and was not pumpable. While it continued sediment, it was commercially worthless. As this deposit was occasioned by the respondent's default, if it could be reliquefied and thus made again commercially valuable, it was its duty, and not the libelant's, to put it into liquid form and pump it into libelant's pipe lines.

This defense of respondent is also without merit.

The remaining contention of the respondent, viz., "*If the court finds that part of the loss was due to the negligence of the carrier, and part due to the quality and kind of creosote shipped,* libelant must show how much of the damage was due to the negligence of the vessel," needs no consideration, as the finding herein is that the loss was not due to the character of the oil, but solely because the carrier neglected to fulfill its obligation to keep it heated at the required temperature. The libel is sustained, and the cross-libel is dismissed.

If the parties cannot agree as to the amount of the shortage, and the consequent loss in damages to the libelant, a reference will be ordered. A decree in accordance herewith may be submitted.